UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JINNI TECH, LTD.; BRUCE ROYCE, | Case No.: |
| Plaintiffs, | COMPLAINT |
| v. | |
| RED.COM, INC., D/B/A RED DIGITAL CAMERA; JARRED LAND, | |
| Defendants. | |

Plaintiffs, by and through their undersigned counsel, allege as follows:

## I.  NATURE OF THIS ACTION

1.      This action arises out of the conduct of RED.com, Inc. d/b/a RED Digital Camera ("RED") and its President Jarred Land (collectively "Defendants").

2.      Defendant RED manufactures high-end, digital RED cameras and accessories for its RED cameras.

3.      RED deters competition for RED-compatible SSD media through a campaign of false and misleading claims about its RED SSD media accessory, the RED Mini-Mag, which enables RED to charge price premiums for its SSD media accessories.

COMPLAINT - 1

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

4.      When a competitor enters the market with a lower-cost, alternative, RED makes false and disparaging claims and intimidating statements about the competitor and its products.

5.      In July 2016, Plaintiff Jinni Tech, Ltd. ("Jinni Tech") launched a new, affordable SSD media called the JinniMag.

6.      Defendants immediately responded with a campaign of false and disparaging statements, labeling Jinni Tech as criminals, hackers, pirates, thieves and scammers, in a series of Internet posts on reduser.net, a popular forum for RED users that is owned and operated by RED, and on widely used Facebook user groups for RED users.

7.      These statements are false, as Jinni Tech developed its own SSD media using widely available hardware and software, to which RED has no proprietary rights.

8.      Defendants nevertheless incited and encouraged RED's users to adopt their false and malicious statements as the truth.

9.      Many of RED's users did, in fact, adopt Defendants' malicious statements as the truth and republished them across the Internet, including on Facebook and reduser.net.

10.     Moreover, RED's users, with RED's encouragement and support, posted the personal email, phone number and images of Bruce Royce, Jinni Tech's founder, and proceeded to harass Mr. Royce through vulgar and physically intimidating statements.  RED took no steps to remove Mr. Royce's personal information from reduser.net, or to put an end to this campaign of harassment that Defendants started with their false, disparaging and inflammatory statements.

11.     As a result of Defendants' conduct, Jinni Tech lost orders and suffered irreparable harm to its reputation. Additionally, Mr. Royce suffered injury to his reputation and severe emotional distress as a result of RED's false statements and its incitement of harassment of Mr. Royce personally.

COMPLAINT - 2

## II.   PARTIES

12.     Plaintiff Jinni Tech, Ltd. is a United Kingdom corporation with its principal place of business in United Kingdom.

13.     Plaintiff Bruce Royce is the President and founder of Jinni Tech.

14.     Mr. Royce is also a filmmaker who has been working in the cinematography industry for twenty-five years. He has worked for broadcasters such as BBC and RFE/RL, Media City, SKY, and ITN, and for famous product brands as a contractor, producer, and director.

15.     Defendant RED is a Washington corporation.

16.     Defendant Jarred Land is the President of RED.

## III. JURISDICTION AND VENUE

17.     This action arises under 15 U.S.C. § 1125(a) and the statutory law of the state of Washington. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (Lanham Act claims), and 28 U.S.C. § 1367 (supplemental jurisdiction over pendant state law claim).  This Court also has jurisdiction because the parties are citizens of different states and the amount in controversy exceeds $75,000.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

19.     RED is incorporated in the State of Washington, and markets and sells its products to customers in the State of Washington.

20.     RED made false and disparaging statements about its competitor Jinni Tech, the JinniMag SSD media, and Mr. Royce to RED users throughout the United States, including specifically customers and other users based in the State of Washington.

COMPLAINT - 3

21.     Moreover, Mr. Land in his capacity as RED's President, and in his individual capacity, made false and disparaging statements about Jinni Tech, its JinniMag SSD media, and Mr. Royce to customers and other users in the State of Washington.

22.     Defendants also encouraged and incited RED users, including customers and other users located in the State of Washington, to disparage and harass Plaintiffs on Facebook and reduser.net, which is owned and operated by RED.

## IV.  FACTUAL ALLEGATIONS

23.     This action seeks redress for Defendants' deliberate, false and misleading claims regarding RED's SSD media accessories for RED cameras, and Defendants' false and disparaging statements about Jinni Tech, its competing JinniMag SSD media, and Mr. Royce.

### A.  **Jinni Tech Enters the Market for Camera Accessories that are Compatible with Red Cameras**

24.     Jinni Tech is a business that manufactures, among other things, SSD media that can be utilized in certain high-end cameras manufactured by RED.

25.     Jinni Tech recognized the customer demand for developing and bringing affordable filmmaking equipment to the market.

26.     Jinni Tech has invested hundreds of thousands of dollars to develop accessories for RED cameras that it can sell to RED users as a cost-reasonable alternative to RED's camera accessories.  It is developing SSD media, as well as other high-end camera products, with the aim of establishing a global Jinni Tech camera brand.

27.     Jinni Tech introduced its first product, an SSD media accessory called JinniMag, on July 31, 2016.  It launched its Facebook site and website on August 1-2, 2016.

28.     Jinni Tech markets JinniMag as an affordable third-party media accessory that is compatible with RED cameras.

29.     Jinni Tech offered its JinniMag SSD media for sale at a significantly lower price than the competitive RED Mini-Mag SSD media.

COMPLAINT - 4

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

30.     Beginning on or about July 31, 2016, almost immediately upon Jinni Tech's JinniMag launch, Defendants responded with a campaign against Jinni Tech, JinniMag and Mr. Royce: (1) making false and misleading claims about the RED Mini-Mag SSD media to make it appear to consumers that RED cameras would not work as well or were not compatible with Jinni Tech's SSD media, (2) making false and disparaging claims about Jinni Tech, its competing JinniMag SSD media, and its founder Mr. Royce, labeling Plaintiffs as criminals, hackers, pirates, thieves and scammers, among other things, and (3) interfering with Jinni Tech's prospective relationship with RED users who are in the market for lower-cost SSD media that is compatible with RED cameras.

### B.   RED's False Advertising Claims about its RED SSD Media

31.     RED sells high-end, digital cameras in a niche market with very selective clientele.  RED sells its cameras through its own red.com website, select RED stores, and authorized RED dealers.

32.     RED provides a one-stop shop for RED digital cameras and camera accessories, including SSD media.  RED sells an SSD media accessory called the RED Mini-Mag, which it markets as "the smallest, fastest, and most powerful media option available" for use with RED cameras.

33.     RED markets its products through its website, on Facebook, and through reduser.net, a RED user forum that is owned and operated by RED.

34.     The reduser.net forum is a place for individual RED camera owners, production company owners, RED rental house owners who offer RED cameras and accessories, camera operators, motion picture bloggers, and journalists to share information about RED cameras and accessories.  Members comprise a significant portion of the active cinematography industry and a critical customer base for any manufacturer of high-end digital camera accessories.

35.     Reduser.net has over sixty thousand registered members, and at times the site exceeds 50,000 active online users.

COMPLAINT - 5

36.     RED historically has had very little competition for its proprietary RED accessories.  This enables RED to sell RED camera accessories, such as the RED Mini-Mag, at a significant price premium.

37.     Many RED users have expressed an interest in lower-priced, third-party accessories such as SSD media that are compatible with RED cameras.

38.     RED markets its SSD media accessories in numerous ways that are false and misleading to consumers, particularly those who are interested in lower-priced, third-party SSD media.

39.      RED claims that it develops the hardware and firmware for its RED SSD media, and spends millions of dollars testing, certifying and quality controlling its media.

40.     In a post on reduser.net, dated July 31, 2016, RED claimed, for example:

> For our media, we developed our own IP and Firmware and spent millions of dollars testing, certifying and QC every media card that we ship. Its why we have significantly less card errors than other companies using generic media . . . even reputable generic media.

41.     In a subsequent post on reduser.net, dated August 4, 2016, RED claimed:

> We go through a lot of expense to get heavily screened memory and a lot of testing goes into making sure it is the best available . . . that we make custom firmware specific to the cards and we have a pretty extensive QC and our development on media is pretty insane and go through many, many, many years of testing with a lot of engineers to pass all our media . . .

42.     RED's assertions are factual statements that RED developed proprietary, custom hardware and software for its RED SSD media.  These statements are false.

43.     In truth, RED purchases commercially available hardware components from other manufacturers and encloses those non-proprietary components in a RED branded encasement. RED does not own any intellectual property in those hardware components.

44.     Specifically, the RED MINI-MAG uses generic memory cards manufactured by Micron, as well as Samsung and Kingston, that are available to any business.  It uses publicly

COMPLAINT - 6

available firmware supplied by the memory card manufacturer without customization.  It also uses a pass-through adapter and connector ends that are off-the-shelf products from other manufacturers.

45.     RED's claim that *RED spent* millions of dollars testing, certifying and quality controlling its RED SSD memory is a factual assertion that makes it appear that Jinni Tech or other competitors cannot develop equally effective SSD media that is compatible with RED cameras.

46.     RED's additional claim that, because of its testing and quality control measures, its SSD cards experience less card errors than other companies is a factual assertion that RED has proven its claims by competent and reliable scientific evidence.

47.     Those factual assertions are untrue.  While RED's hardware and software might have been tested by the actual hardware and software manufacturers, RED cannot support its claim that it spent millions of dollars testing, certifying and quality controlling its RED Mini-Mag SSD media, or that Jinni Tech's SSD media is not equally effective.

48.     RED never conducted a test comparing RED SSD media to Jinni Tech or other manufactures, and it has no test results that show that its RED Mini-Mag has superior card error rates.  There is no competent or reliable evidence that RED's SSD media error rates are lower than compatible SSD media manufactured by Jinni Tech or other companies.

49.     RED also falsely claims that RED owns patents in the technology used in its proprietary RED SSD media, and that companies who make SSD media that is compatible with RED cameras are infringing its patents.  RED's patents, which are identified on its website, do not, however, cover the technology used by competing SSD media.

50.      RED's false statements are designed to deter Jinni Tech's potential customers from buying alleged infringing Jinni Tech SSD media.

COMPLAINT - 7

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

51.     RED also falsely marks its SSD media accessories as "Made in USA." In truth, RED's SSD media components are made by manufacturers in China and South Korea, not the United States.

52.     Specifically, RED uses off-the-shelf, generic SSD media hardware components taken from a variety of SSD suppliers such as Kingston (manufactured in China), Micron/Crucial (manufactured in China), and Samsung (manufactured in South Korea). RED encapsulates this SSD media within its own encasement to disguise the actual source of its media accessories.

53.     RED also markets 480GB SSD media as 512GB SSD media. At least some of the RED Mini-Mag SSD media that is marked as 512GB is 480GB SSD media. Inside the enclosure for RED 512GB SSD media, the SSD is marked with stickers that clearly state that the SSD media holds 480GB.

54.     RED's use of this false description of its SSD media misleads its consumers into believing that that they were receiving better performance and value than the RED Mini-Mag 512GB provides.

55.     RED's claims, in total, cause consumers to believe that RED's SSD media are superior to third-party components, and that, thus, RED is justified in charging consumers a substantial premium over alternative, RED-compatible SSD components.

### C.  RED's Trade Libel and Disparagement of Jinni Tech and its JinniMag SSD Media

56.     In or about July 2016, RED's owner Jarred Land became aware of Jinni Tech's launch of its new JinniMag SSD media and immediately began a campaign to disparage Jinni Tech and its new product through social media and elsewhere.

57.     Jinni Tech promoted its JinniMag product launch, among other ways, on the RED Scarlet-W Facebook group. That Facebook group consists of approximately 2,500 RED camera users, who represent some of the most relevant and influential target customers for Jinni Tech.

COMPLAINT - 8

58.     On July 31, 2016, Jinni Tech posted a "coming soon" message for JinniMag: 1.0, "Affordable, Fully Compatible RED Mags," on the RED Scarlet-W Facebook group.

59.     That same day, Mr. Land responded on the Facebook group:

> This is not legit . . . not certified . . . not endorsed and will never be because it's bullshit.  Even if this was real there are too many inaccuracies and violations going on here to list.

60.     Mr. Land's statement was false and disparaging.  As Mr. Land was aware, there were no inaccuracies or violations in Jinni Tech's "coming soon" announcement.

61.     Mr. Land's post was republished on other professional Facebook groups such as "RED camera" (7,997 members) and "RED RAVEN Camera" (2,518 members).

62.     In response to Mr. Land's post, multiple Facebook users referenced the JinniMag advertisement and warned RED customers and other users that Mr. Land identified JinniMag as a "scam" and "IP theft" and "a fake."

a.     One user posted pictures of the JinniMag and stated: "I'm going to start a post about this.  So other users can be notified about this matter.  This is purely a scam and I beg users not to entertain them."  He later posted, "It's fake, and you should stay clear away from them.  Please stay clear of these."

b.     Another user stated: "The mini mag is patented. If on[e] exists that's not made by RED then it's IP theft."  The user later added, "I know specifically the connection to the camera is patented. The other guys are patented as well but those are irrelevant because these guys are cutting so many corners that likely they are not using red tech which is what makes them scary."  Finally, the user encouraged other RED users to message Mr. Land directly to learn more details about this "IP/patent theft."

c.     Another user posted: "I can't for the life of me figure out how these guys have managed to get as far as bringing these things to market without a law suit getting in the way. It's such blatant, shameless copyright infringement and theft, so anyone who supports these guys are really making their own bed. Apart from being shunned from the community which is one of the

COMPLAINT - 9

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

most valuable resources any shooter can find, along with all the inherent risks involved with shooting on pirated media, they're supporting criminals who are shitting on the creative integrity of the very camera manufacturer that they're shooting on."

63.     Defendants followed their initial false statements with a series of additional false and disparaging posts describing Jinni Tech and/or Mr. Royce as a hacker, a pirate, and a thief.

64.     Mr. Land's purpose was to incite RED users to avoid JinniMag and to spread the word about the JinniMag scam.  In fact, many additional RED users, including those on reduser.net, a forum owned and operated by RED with tens of thousands of members, adopted Mr. Land's message about the Jinni Tech scam as the truth.

65.     For example, on July 31, 2016, the reduser.net moderator referenced Mr. Land's false accusation made on the RED Scarlet-W Facebook group: "As Jarred mentioned earlier today via the online discussion on the book of face, this is a scam."  Then, he republished Mr. Land's Facebook message.

66.     On the same date, Mr. Land posted a message on the reduser.net forum, stating that Jinni Tech was hacking, duplicating and stealing RED's intellectual property:

> For some random company to hack and duplicate our IP and our firmware (which is the only way they could do this) is exactly like someone stealing your films and calling them their own and selling them to others.

> I don't know where this company is from. I assume the UK cover is just bullshit. Someone said China but I really hope this is not the case as China has made such significant improvements over the last decade turning around their attitude towards Copyright infringement, Trademark violations, and IP theft (which it appears this company has broken all three in one swoop)

> I will shut RED completely down... I am not kidding... If stealing each other's shit suddenly is deemed acceptable.

67.     Mr. Land had no factual basis for accusing Jinni Tech of "hacking" or "stealing" RED's intellectual property.  Those statements were false and made for the malicious purpose of deterring customers from purchasing the JinniMag SSD media.

COMPLAINT - 10

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

68.     Influenced by Mr. Land's campaign, RED users republished and restated Mr. Land's false and disparaging claims about the so-called Jinni Tech scam, including in at least the following RED user posts on reduser.net between July 31-August 4, 2016:

a.      "These cheap knock off SSDs are clearly engaging in criminal behavior.  Not OK. Stealing tech . . . yet wrapping themselves in the flag of 'competition' . . . is NOT how capitalism works."

b.      "Saw this on FB and thought maybe it was a third-party licensing deal. Definitely won't be looking into it anymore since, according to Jarred, they just ripped the RED Mag off completely. Idiots."

c.      "[F]uck the pirates and scammers!  I did a DNS look-up, and their page appears to be hosted in the US: jinnimag.com."

d.      "There is of course the moral factor, of supporting a product from a company which has stolen someone else's fruit of their hard labor and financial commitment."

e.      "Why not just ban Redusers who endorse such stealing? I mean, you don't have to shut down Red, shut them down instead :)"

f.      "And in this particular case it's not even just about copying and a big fuck you into your direction.  He's also motivated to attack you and tried to gather people by playing them cheaply. . . . All that shows a lot more criminal energy (and psychological problems) than the (sadly) usual of copying of a product."

g.      "After years of proven reliability and robust build larger capacities, etc someone decided to just take that which does not belong to them and offer it out to the public. It's theft. It's not different from me carjacking you or walking into your house and leaving with a TV under my arm."

69.     A RED user even posted the name, personal email and phone number for Jinni Tech's founder, Bruce Royce, "so, the lawyers can reach him."

COMPLAINT - 11

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

70.     Moreover, when RED users expressed appreciation for Jinni Tech's lower-priced JinniMag alternative, Mr. Land would shout them down with intimidating messages aimed at inflaming RED's users against Jinni Tech, as well as the RED users who supported Jinni Tech or the JinniMag product.

71.     For example, in a post on August 1, 2016, one RED user said: "I don't like RED's media prices, we all know they are incredibly over-inflated $/per/GB.  But I still had to purchased (sic) a few. . . And if these come to market, I will pick up a few of these as well . . ."

72.     In apparent response, the same day, Mr. Land compared Jinni Tech's business model and practices to illegal movie privacy in a post on the reduser.net forum:

> We invented something. Someone is saying they have stole it. And you are sitting there telling everyone that is ok.
>
> It is the same as if you saved up or borrowed $10,000,000 and went and wrote and directed and shot your film. you edit it together and finish it and put it up on Itunes for $9.99 to get your money back. But someone from china looks at your film and likes it and says "Fuck that guy charging $9.99 for his film on Itunes. I don't think people should pay that much. Lets just download this guys film, steal it, change the opening credits with our logo and reupload it on Itunes and only charge $1.00.  That's not right.

73.     In the same post, Mr. Land bullied and intimated RED's users and insinuated that he was bringing a lawsuit against Jinni Tech:

> Lawyers will deal with these guys doing this . . . but it is you guys that think that this is OK that have me way way way more pissed off.

74.     In another post on August 1, 2016, Mr. Land exclaimed, "the blatancy is shocking . . . The whole 'yeah, i'm stealing your shit, fuck you attitude.  It's crazy. The whole world just seems to have gone to shit."

COMPLAINT - 12

75.     Another Facebook user posted in response to the JinniMag advertisement, "very exciting!"  Immediately following, another user parroted RED's campaign message in a reply, "sounds like they just want to collect $ from a bunch of orders then never deliver if you ask me."

76.     RED's users continue to repeat and repost Mr. Land's disparaging comments about Jinni Tech and JinniMag, including on Facebook, where Mr. Land and his followers created and encouraged a destructive frenzy of misinformation about Jinni Tech and the JinniMag:

a.     One user posted: "Jarred Land can and should try to take them down through the FBI. They can stop the products coming into the USA for violating federal copyright laws in the USA. They can make it where the cards can be confiscated as well as voiding any further support to RED.COM officially if they want to play hardball. They can be turned into contraband through the help of federal law enforcement and our US CUSTOMS ENFORCEMENT LAWS."

b.     Another user posted that "if anyone seriously thinks that a) this is coming out of the United Kingdom b) is even slightly legit on any level or c) RED would ever let this go down . . . then hit me up now - I've got a Sydney Harbor Bridge you will definitely be interested in buying . . . and going cheap! Just need a deposit for the 'preorder.'"  The same user then posted a message from Mr. Land stating that he would "shut RED completely down" if users support this company that is "stealing" from RED.

c.     Other users posted that RED would sue Jinni Tech, block its product through its customized firmware, or void customer warranties if they were caught using JinniMag.

77.     A series of recent examples on reduser.net again republished Mr. Land's false and disparaging statements and warned RED users about the JinniMag:

a.     A RED user posted a message on December 27, 2016, with a link to jinnimag.com, saying, "Check these out.......lifesavers...and thank me later."  Immediately, a different RED user warned in response: "Not a good idea to be promoting that around here."

COMPLAINT - 13

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

b.      Also on December 27, 2016, another RED user re-posted a link to Mr. Land's disparaging comments from July 31, 2016, and further responded that "Jarred had some very stern warnings when this came up in the past. Basically it's IP theft. I would take the warnings seriously."

c.      On December 28, 2016, another RED user stated: "No matter where these mags are built, it is theft on many levels.  That anyone on this REDUser forum would advocate their use is beneath contempt.  You are throwing shit in the face of the folks that have worked hard to bring these cameras and technology into our hands."

78.     Jinni Tech has observed that after Mr. Land's disparaging campaign, many potential customers who expressed an interest in buying his products declined to do so.  For example:

a.      As one RED user posted on Facebook shortly after the JinniMag launch, "I was excited by [JinniMag] when they were first announced, but now that it turns out that they've got no permissions to create them I'm steering well clear."

b.      Another RED camera user ordered the JinniMag SSD media accessory on November 26, 2016.  After seeing RED's comments on Facebook, however, she posted a reply on Facebook stating, "Bad mojo . . . I'm not touching these."  On November 27, 2016, she canceled her JinniMag order.

c.      Another RED user ordered the JinniMag SSD media accessory on December 1, 2016. That same day, the customer viewed RED's Facebook comments and posted in reply, "RED will probably blacklist" the JinniMag product.  Later that day, the customer canceled his JinniMag order.

79.     Jinni Tech refunded these and many other JinniMag customer orders based on cancelations that occurred during RED's campaign of false and disparaging communications about Jinni Tech and JinniMag.

COMPLAINT - 14

80.     To date, a Google search for "JinniMag" continues to bring up Mr. Land's disparaging comments about the JinniMag "scam" on reduser.net as a top five search engine response.

**D.  RED and Mr. Land Incited RED's Users to Personally Attack and Disparage Jinni Tech's Founder Bruce Royce**

81.     On reduser.net, on August 1, 2016, in a thread in which Mr. Land and others posted about the JinniMag "scam," a RED user posted Mr. Royce's name, personal email and phone number for all RED users to see.

82.     Neither RED nor Mr. Land removed the post or warned RED's users not to post personal information about Mr. Royce.  In fact, Mr. Land continued to post statements labeling Jinni Tech, JinniMag, and Mr. Royce scammers even after the publication of Mr. Royce's personal information.

83.     RED owns and operates the reduser.net forum, and continues to maliciously publish Mr. Royce's private, personal information, thereby encouraging and condoning RED user's online harassment of Mr. Royce.

84.     With Defendants' encouragement, RED's users escalated this pattern of personal abuse by posting Bruce Royce's information on Facebook as well.

85.     In further response, users began to post a series of vicious, personal attacks against Mr. Royce:

a.     One user posted, "Fuck this guy . . . Jarred is going to bury his giant foot in his ass."

b.     Another user posted, "Hey cunt face Bruce not saying anything?"

c.     Still another user posted, "This beautiful man happened," attaching Bruce Royce's image to the post.

d.     Another user posted an image of Mr. Royce's twitter page.  The same user posted, "I just reverse engineered Bruce Royce," and attached a doctored image of Mr. Royce.  A

COMPLAINT - 15

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

different user responded, "Now we can sell him!"  Still another user responded, "I FUCKING KNEW IT! He was also acting as two people!  Acting as a boss, and acting as someone that so called fucking bought one. First glass (sic) CUNT!"

86.    Mr. Land posts on these same Facebook user forums, including about Jinni Tech and JinniMag, but he never took any steps to discourage RED users from making these vicious, personal attacks against Mr. Royce.

87.    Mr. Royce is a RED camera owner and operator, filmmaker, and colleague of many RED users who read and post on reduser.net and RED Facebook pages.  He has been working in the cinematography industry for twenty-five years and has an established reputation. He has worked for broadcasters such as BBC and RFE/RL, Media City, SKY, and ITN, and for famous product brands as a contractor, producer, and director.

88.    RED's labeling of Jinni Tech as a "scam," a "criminal," and "thief," and its encouragement of RED users to personally attack Mr. Royce because of his Jinni Tech "scam" has caused serious damage to Mr. Royce's professional reputation.

89.    These vicious, personal attacks have caused Mr. Royce and his family serious emotional distress, anxiety, and stress, resulting in harm to Mr. Royce's emotional and physical health, including severe physical pain and a sleep disorder.

## COUNT I
### (False Advertising under 15 U.S.C. § 1125(a))

90.    Plaintiff Jinni Tech incorporates by reference the allegations as set forth above.

91.    RED has made and distributed in interstate commerce and in this District advertisements that contain false and misleading statements of fact regarding its products.

92.    These advertisements contain actual misstatements and/or misleading statements or failures to disclose, specifically RED's claims that:

COMPLAINT - 16

a.    RED develops customized hardware and software for its RED SSD media accessories;

b.    RED spends millions of dollars testing, certifying and quality controlling its SSD media accessories;

c.    RED's SSD media experiences less errors than other companies' RED-compatible SSD media;

d.    RED owns patents in the technology used in its RED SSD media that is infringed by other companies who make RED-compatible SSD media;

e.    RED's false marking of its SSD media as made in the United States;

f.    RED's false marking of its 480GB SSD media as 512GB SSD media.

93.    These statements actually deceive, or have a tendency to deceive, a substantial segment of the customers and potential customers for RED-compatible SSD memory.

94.    This deception is material in that it concerns an inherent quality or characteristic of RED's SSD media and is likely to influence the purchasing decisions of RED's users.

95.    RED's false and misleading advertising statements and omissions injure both consumers and Plaintiff Jinni Tech.

96.    RED's false and misleading advertising statements and omissions violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

97.    RED has caused, and will continue to cause, immediate and irreparable injury to Jinni Tech, including injury to Jinni Tech's business, reputation and goodwill, for which there is no adequate remedy at law.  Jinni Tech is therefore entitled to an injunction under 15 U.S.C. § 1116 restraining RED, Mr. Land, and RED's agents, employees, representatives and all persons acting in concert with RED from engaging in future acts of false advertising and ordering removal of all of RED's false advertisements.

98.    Pursuant to 15 U.S.C. § 1117, Plaintiff is further entitled to recover from RED:

COMPLAINT - 17

a.      the damages sustained by Jinni Tech as a result of RED's acts in violation of 15 U.S.C. § 1125(a);

b.      the gains, profits and advantages that RED has obtained as a result of RED's acts in violation of 15 U.S.C. § 1125(a); and

c.      the costs of this action.

99.      Moreover, RED's conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Jinni Tech to recover additional damages and reasonable attorneys' fees.

## COUNT II
### (Unfair Competition Under 15 U.S.C. 1125(a))

100.      Plaintiff Jinni Tech incorporates by reference the allegations as set forth above.

101.      RED's malicious campaign against Jinni Tech as its competitor constitutes unfair competition.

102.      RED's wrongful acts include making false statements to the public for the purpose of disparaging Jinni Tech and deterring customers from switching their purchases from RED Mini-Mag to Jinni Tech's JinniMag.

103.      These acts include false and disparaging statements:

a.      identifying Jinni Tech and JinniMag as a scam,

b.      accusing Jinni Tech of making false claims and committing violations,

c.      accusing Jinni Tech of stealing from RED and committing intellectual property theft, and

d.      labeling Jinni Tech as a criminal, a hacker, and a pirate.

104.      These acts also include encouraging and inciting RED users to adopt RED's false and disparaging statements and republish or restate them across the Internet and global marketplace.

COMPLAINT - 18

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

105.     These acts also include Defendants' bullying of RED's camera users to avoid purchasing JinniMag or be shunned from RED, amongst other threats.

106.     These acts violate Section 43(a) of the Lanham Act.

107.     Plaintiff Jinni Tech is entitled to an injunction stopping the Defendants from continuing to engage in this malicious campaign.

108.     RED's acts have damaged Jinni Tech in an amount to be proven at trial.

### COUNT III
### Product Disparagement/Trade Libel
### (Washington Common Law)

109.     Plaintiff Jinni Tech incorporates by reference the allegations as set forth above.

110.     RED and Mr. Land conducted a malicious campaign against Jinni Tech and its JinniMag product by making false and disparaging statements about their qualities and integrity.

111.     These false and disparaging statements include:

a.     identifying Jinni Tech and JinniMag as a scam,

b.     accusing Jinni Tech of making false claims and committing violations,

c.     accusing Jinni Tech of stealing from RED and committing intellectual property theft, and

d.     labeling Jinni Tech as a criminal, a hacker, and a pirate.

112.     By making these statements, Defendants intentionally and maliciously published to RED users false and disparaging allegations that impugned the quality and/or integrity of Jinni Tech's products, which caused customers not to deal with Jinni Tech.

113.     Defendants RED and Mr. Land also encouraged and incited RED's users to adopt RED's false and disparaging statements and republish or restate them across the Internet and global marketplace, causing even more consumers to choose not to deal with Jinni Tech.

114.     Therefore, Defendants RED and Mr. Land are liable to Jinni Tech for product disparagement/trade libel.

115.     Defendants' acts have damaged Jinni Tech in an amount to be proven at trial.

COMPLAINT - 19

1

2

**COUNT IV**
**Tortious Interference**
**(Washington Common Law)**

3    116.    Plaintiffs incorporate by reference the allegations as set forth above.

4    117.    Plaintiff Jinni Tech has valid business expectancies with consumers of RED

5    cameras and RED-compatible camera accessories.

6    118.    Defendants are aware of those business expectancies.

7    119.    By engaging in the malicious campaign described above, Defendants intentionally

8    interfered with Jinni Tech's business expectancies, causing a termination of those business

9    expectancies.

10   120.    Defendants' interference is for an improper purpose and used improper means.

11   121.    Customers who preordered the JinniMag canceled their orders after reading

12   RED's and Mr. Land's messages on Facebook and reduser.net.  Other interested customers were

13   deterred from placing orders.

14   122.    Defendants' interference damaged Jinni Tech in an amount to be proven at trial.

15

16

**COUNT V**
**Unfair Competition**
**(Washington Consumer Protection Act, RCW 19.86)**

17   123.    Plaintiff Jinni Tech incorporates by reference the allegations as set forth above.

18   124.    Defendants intended for the acts described above to harm Plaintiffs in their

19   business within the State of Washington.

20   125.    Such acts constitute unfair methods of competition and unfair trade practices,

21   which are damaging to the public interest in violation of the Washington Consumer

22   Protection/Unfair Business Practices Act, RCW 19.86.

23   126.    Defendants' unfair methods of competition occur in trade or commerce and cause

24   injury to Jinni Tech's business, including the loss of sales, customers, and goodwill.

25

26

COMPLAINT - 20

127.    As a result of Defendants' unfair business practices, Plaintiff Jinni Tech has been damaged in an amount to be proven at trial, and will be irreparably harmed if such wrongful conduct is allowed to proceed.

128.    Pursuant to RCW 19.86.090, Plaintiff Jinni Tech is entitled to its actual damages, an injunction restraining Defendants' unfair competition, its attorney's fees, and punitive damages.

**COUNT VI**
**Violating Right of Privacy**
**(Washington Consumer Protection Act, RCW 9.73.060)**

129.    Plaintiff Mr. Royce incorporates by reference the allegations as set forth above.

130.    Defendants RED and Mr. Land incited and encouraged RED's users to violate Mr. Royce's privacy by making false and disparaging claims about his activities as the founder of Jinni Tech.

131.    With RED's and Mr. Land's encouragement, RED's users invaded Mr. Royce's privacy by posting his personal information on the reduser.net site, in the context of claims that he stole from RED and was scamming RED users, for tens of thousands of RED users to view.

132.    RED owns and operates the reduser.net site, but took no action to remove Mr. Royce's personal information from the site.

133.    With RED's and Mr. Land's encouragement, RED's users invaded Mr. Royce's privacy by posting his personal information on Facebook for hundreds of thousands of users to view.

134.    As a result of Defendants' violations of Mr. Royce's right to privacy, Mr. Royce has suffered injuries to his businesses, his personal emotional and physical well-being, his family's well-being, and his professional and personal reputation.

135.    Mr. Royce is entitled to actual damages, including mental and physical pain and suffering endured on account of Defendants' violation of his right to privacy, and reasonable attorney's fees and other costs of litigation.

COMPLAINT - 21

## COUNT VII
### Intentional or Negligent Infliction of Emotional Distress
### (Washington Common Law)

136.    Plaintiff Mr. Royce incorporates by reference the allegations as set forth above.

137.    Defendants RED and Mr. Land intentionally or negligently incited and encouraged RED's users to personally harass Mr. Royce by, among other means, making false and disparaging claims about his activities as the founder of Jinni Tech.

138.    With RED's and Mr. Land's encouragement, RED's users posted Mr. Royce's personal information on the reduser.net site for tens of thousands of RED users to view.

139.    RED owns and operates the reduser.net site, but took no action to remove Mr. Royce's personal information from the site.

140.    With RED's and Mr. Land's knowledge and encouragement, RED's users posted Mr. Royce's personal information on Facebook for hundreds of thousands of users to view.

141.    With RED's and Mr. Land's knowledge and encouragement, RED's users posted vulgar, profane, and physically intimidating messages directed personally toward Mr. Royce.

142.    As a result of Defendants' actions, Mr. Royce and his family have suffered injuries to their emotional and physical well-being.

143.    Mr. Royce is entitled to actual damages, including mental pain and suffering endured on account of Defendants' actions, and punitive damages.

## COUNT VIII
### Defamation
### (Washington Common Law)

144.    Plaintiff Mr. Royce incorporates by reference the allegations as set forth above.

145.    Between July 2016 and the present, Defendants RED and Mr. Land made statements of and concerning Mr. Royce on Internet forums such as Facebook and reduser.net.

146.    In messages to hundreds of thousands of users, Defendants falsely labeled Mr. Royce and his company as criminals, hackers, pirates, scammers, and thieves.

COMPLAINT - 22

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

147.     Defendants knew these statements were false or acted in reckless disregard to their falsity.

148.     The recipients of these messages understood them to be about Mr. Royce.  In response, many of the recipients posted personal information about Mr. Royce, encouraged RED's lawyers to contact him personally, and made vulgar and physically threatening comments about Mr. Royce.

149.     Defendants' messages are defamatory per se, as they labeled Mr. Royce as a criminal, hacker, pirate, scammer and thief, and injured Mr. Royce's reputation in the cinematography and camera manufacturing profession.

150.     With RED's and Mr. Land's knowledge and encouragement, RED's users re-posted and posted additional messages directed personally at Mr. Royce, reaching even more recipients and further labeling him as a criminal, hacker, pirate, scammer and thief.

151.     As a result of Defendants' actions, Mr. Royce has suffered injuries to his professional reputation and emotional and physical well-being.

152.     Mr. Royce is entitled to actual damages, including mental pain and suffering endured on account of Defendants' actions and reputational damages, as well as punitive damages.

**COUNT IX**
**False Light**
**(Washington Common Law)**

153.     Plaintiff Mr. Royce incorporates by reference the allegations as set forth above.

154.     Between July 2016 and the present, Defendants RED and Mr. Land made statements of and concerning Mr. Royce on Internet forums such as Facebook and reduser.net.

155.     In messages to hundreds of thousands of users, Defendants falsely labeled Mr. Royce and his company as criminals, hackers, pirates, scammers, and thieves.

156.     Defendants knew these statements were false or acted in reckless disregard to their falsity.

COMPLAINT - 23

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

157.    The recipients of these messages understood them to be about Mr. Royce.  In response, many of the recipients posted personal information about Mr. Royce, encouraged RED's lawyers to contact him personally, and made vulgar and physically threatening comments about Mr. Royce.

158.    Defendants' messages portrayed Mr. Royce in a false or misleading light.  The statements labeling Mr. Royce and his company as criminals, hackers, pirates, scammers, and thieves are highly offensive and embarrassing to a reasonable person of ordinary sensibilities.

78.    With RED's and Mr. Land's knowledge and encouragement, RED's users re-posted and posted additional messages directed personally at Mr. Royce, reaching even more recipients and further labeling him as a criminal, hacker, pirate, scammer and thief.

79.    As a result of Defendants' actions, Mr. Royce has suffered injuries to his emotional and physical well-being.

80.    Mr. Royce is entitled to actual damages, including mental pain and suffering endured on account of Defendants' actions and reputational damages, as well as punitive damages.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs respectfully requests a jury on all claims stated herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.    For temporary, preliminary and permanent injunctive relief prohibiting RED, its agents, or anyone working for, in concert with or on behalf of RED from engaging in false or misleading advertising with respect to its RED SSD media accessories and/or violating Section 43(a) of the Lanham Act, which relief includes but is not limited to removal of all false or

COMPLAINT - 24

misleading advertisements and corrective advertising to remedy the effects of RED's false advertising;

b.      For an order requiring RED to correct any erroneous impression persons may have derived concerning the nature, characteristics or qualities of its RED SSD media accessories, including without limitation the placement of corrective advertising and providing written notice to the public;

c.      For an order correcting any erroneous impression persons may have derived concerning the nature, characteristics or qualities of the JinniMag SSD media accessories, including without limitation the placement of corrective advertising and providing written notice to the public;

d.      For an order requiring RED to remove all personal information about Mr. Royce from reduser.net.

e.      For an order correcting any and all false statements about Mr. Royce or his company.

f.      That RED be adjudged to have violated 15 U.S.C. § 1125(a) by unfairly competing against Plaintiff by using false, deceptive or misleading statements of fact that misrepresent the nature, quality and characteristics of its RED SSD media accessories;

g.      That RED be adjudged to have violated Washington Consumer Protection Act, RCW 19.86, by engaging in deceptive trade practices and injuring Plaintiff by using deceptive representations in connection with its goods or services;

h.      That Plaintiffs be awarded damages Plaintiffs have sustained in consequence of Defendants' conduct;

i.      That Plaintiff Jinni Tech be awarded RED's profits obtained by RED as a consequence of RED's conduct;

j.      That Plaintiffs recover their costs and attorney fees;

COMPLAINT - 25

CASSUBHAI LAW PLLC
705 Second Ave., Ste. 1300
Seattle, Washington 98104
(206) 219-9512

k.      That all of RED's misleading and deceptive materials be removed and destroyed pursuant to 15 U.S.C. § 1118;

l.      That Plaintiffs be granted prejudgment and post-judgment interest; and

m.      That Plaintiffs have such other and further relief as the Court deems just and proper.

Dated this 10th day of February 2017

**CASSUBHAI LAW PLLC**

By   _/s Hozaifa Y. Cassubhai_____
                Hozaifa Y. Cassubhai, WSBA No. 39512
                705 Second Avenue, Suite 1300
                Seattle, Washington 98104
                Phone: 206.219.9512
                Facsimile: 206.219.9546
                Email: hcassubhai@cassubhailaw.com

**SPIRO HARRISON**

By   _/s Jason C. Spiro_____
                Jason C. Spiro (*pro hac vice pending*)
                830 Morris Turnpike
                Short Hills, New Jersey 07078
                Phone: 973.232.0881
                Facsimile: 973.232.0887
                Email: jspiro@spiroharrison.com

                *Attorneys for Plaintiffs*