UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JINNI TECH, LTD. et al.,

                Plaintiffs,

    v.

RED.COM, INC., et al.,

                Defendants.

CASE NO. C17-0217JLR

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.   INTRODUCTION

Before the court is Red.com, Inc. and Red.com, LLC's (collectively, "Defendants" or "RED") motion for summary judgment.  (MSJ (Dkt. # 79).) Plaintiffs Jinni Tech, Ltd. ("Jinni Tech") and Bruce Royce (collectively, "Plaintiffs") oppose the motion.  (Resp. (Dkt. # 85).)  The court has considered the motion, the parties' submissions in support of and in opposition to the motion, the relevant portions of the record, and the applicable

//

//

law.  Being fully advised,[1] the court GRANTS in part and DENIES in part Defendants'

motion for summary judgment as set forth below.

## II.    BACKGROUND

**A.    Factual Background**

### 1.  The Mini-Mag and JinniMag

RED manufactures high-end digital cameras used to create motion pictures.  (*See*

2d Land Decl. (Dkt. # 80) ¶ 2.)  RED claims to produce an "ecosystem comprised of

everything from the image capture at the sensors through the camera and its processes to

generate and output compressed RAW image files to storage media."  (*See id.*)  As part of

this "ecosystem," RED produces solid-state drives ("SSDs") that RED markets as

"Mini-Mag."  (*Id.*)  The Mini-Mags store the camera's digitally compressed RAW

recordings until they can be downloaded onto computers for movie post-production.  (*See

id.*; Rankin Decl. (Dkt. # 81) ¶ 2, Ex. 1 ("RED Dep.") at 103:8-104:1.)  RED claims that

its cameras are designed such that without RED firmware in a connected SSD (such as a

Mini-Mag), the RED camera's operating software system cannot properly communicate

with a memory card and thus the system will not function.  (*See* RED Dep. At

42:16-44:8; 2nd Land Decl. ¶ 3.)

In 2016, Mr. Royce's company, Jinni Tech launched for sale an SSD designed for

use with RED's cameras that it called the "JinniMag."  (*See* MSJ at 6; Royce Decl. (Dkt.

# 86) ¶ 2.)  Jinni Tech identified the JinniMags on the "RED Scarlet-W Facebook group"

---

[1] Neither party requests oral argument (*see* MSJ at 1; Resp. at 1), and the court finds oral
argument unhelpful to its disposition of the motion, *see* Local Rules LCR 7(b)(4).

as "Affordable, Fully Compatible Red Mags." (*See* MSJ at 6; FAC (Dkt. # 10) ¶ 67.)
Jinni Tech claims that the JinniMag was an attempt to "break R[ED]'s monopoly on
memory storage devices for RED cameras." (*See* Resp. at 2.) According to Jinni Tech,
RED-branded storage devices "have the same standard features of a generic SSD memory
device." (Royce Decl. ¶ 3.) By designing its system to work only with RED-branded
SSDs, Jinni Tech asserts that RED forces its users to buy RED's storage devices
containing generic SSD cards at premium prices, "allowing R[ED] to price gauge their
customers in the process." (*See id.*)

    2. <u>Online Statements</u>

    Soon after Jinni Tech announced the JinniMag, it became a topic of conversation
in the online forums on Reduser.net, a "social media platform" on which RED users
discuss RED equipment. (*See* 1st Land Decl. (Dkt. # 17) ¶ 4.) Landmine Media, Inc.
("Landmine"), a Colorado corporation of which Jarred Land is a part owner, operates
Reduser.net. (*See id.*) A Reduser.net user created a thread titled "Cheap third party Red
MiniMag replacement – JinniMag?" on in which several users made the following
comments, among others:

> To offer licensing out to 3rd parties seemed unlikely, and yet, these new
> JinniMags ads have the Red logo right on them . . . Has Red endorsed this,
> or is this a lawsuit in the making? . . . EDIT: Thanks Phil for the info.
> Apparently this is a scam.

> Doesn't RED use a proprietary interface?

> Buying any electronic non-authorized 3rd party product for a RED camera is
> a VERY bad idea . . . Do NOT waste your money – you will be sorry.

*//*

What I read there doesn't sound like the best way to introduce yourself as the producer of a product that probably violates patents, copyrights and what not. Copying things is not making things, everyone knows and see's [*sic*] that.

(Rankin Decl. ¶ 7, Ex. 6 ("Forum Posts") at JT001350-53.) On July 31, 2016,

Jarred Land, the president of Red.com, Inc., made the following post:

Guys… I can't tell you how much this pisses me off. Not from a business perspective, but as a patent holder and creator. Like all of you, we spend a lot of time money and effort creating what we do. For our media, we developed our own IP and Firmware and spent millions of dollars testing, certifying and [running quality control ("QC") on] every media card that we ship. Its [*sic*] why we have significantly less card errors than other companies using generic media… even reputable generic media. Media is one of the most critical components of the entire system and the way we write to a card is very different than a normal SSD is programmed for. For some random company to hack and duplicate our IP and our firmware (which is the only way they could do this) is exactly like someone stealing your films and calling them their own and selling them to others. It goes against everything I stand for. I don't know where this company is from. I assume the UK cover is just bullshit. Someone said China but I really hope this is not the case as China has made such significant improvements over the last decade turning around their attitude towards Copyright infringement, Trademark violations, and IP theft (which it appears this company has broken all three in one swoop)[.] I am shocked some of you are here are [*sic*] actually endorsing this. I will shut RED completely down… I am not kidding… [i]f stealing each other[']s shit suddenly is deemed acceptable. It's not a world I want to work or create or live in.

(Forum Posts at JT001357-58.) Several posts supportive of Mr. Land followed, including

the following:

These cheap knock off SSDs are clearly engaging in criminal behavior. Not OK.

Disappointing and not cool.

Saw this on [Facebook] and thought maybe it was a third-party licensing deal. Definitely won't be looking into it anymore since, according to Jarred, they just ripped the RED Mag off completely. Idiots.

(Forum Posts at JT001360-63.)  Mr. Land then made a second post on August 1, 2016, that included in part the following:  "Lawyers will deal with these guys doing this…. But it is you guys that think that this is OK that have me way way way more pissed off[.]"  (Forum Posts at JT001364-65.)

A similar thread on Facebook also started on July 31, 2016, started by Facebook user Behrooz Modirrousta.  (Rankin Decl. ¶ 8, Ex. 7 ("Facebook Posts").)  Mr. Land also posted on this Facebook thread as follows:

> This is not legit . . . not certified … not endorsed and will never be because its [*sic*] bullshit.  Even if this was real there are too many inaccuracies and violations going on here to list but I figure you all are smart enough to see through this.

(Facebook Posts at JT001453.)

Mr. Land's above statements on Reduser.net and on Facebook form the basis of several of Jinni Tech's claims in this lawsuit.  According to Jinni Tech, Mr. Land "never took any steps to discourage RED users from making these vicious, personal attacks against Mr. Royce," Jinni Tech's owner.  (*See* FAC ¶ 95.)  Jinni Tech alleges that these statements "caused serious damage to Mr. Royce's professional reputation" and caused Mr. Royce and his family "serious emotional distress, anxiety, and stress, resulting in harm to Mr. Royce's emotional and physical health, including severe physical pain and a sleep disorder."  (*Id.* ¶¶ 97-98.)[2]

---

[2] Plaintiffs allege in their first amended complaint that "[w]ith Defendants' knowledge and encouragement, RED's users posted Mr. Royce's personal information on Facebook for hundreds of thousands of users to view."  (FAC ¶ 161.)  However, in response to Defendants' motion for summary judgment, Plaintiffs submit no evidence of these Facebook posts and no evidence of any ill effects of such posts on Mr. Royce.  (*See generally* Resp.; Royce Decl.)

## B. Procedural Background

Prior to this lawsuit, RED sued Jinni Tech for patent and trademark infringement, false advertising, unfair competition, unjust enrichment, and breach of contract in the United States District Court for the Central District of California. (*See* Rankin Decl. ¶ 9, Ex. 8.) Jinni Tech subsequently filed suit against RED on February 10, 2017, in this court. (*See* Compl. (Dkt. # 1).) RED subsequently learned through discovery that Jinni Tech "would likely be unable to pay any meaningful damages award should RED prevail" and voluntarily dismissed its lawsuit without prejudice. (*See* Rankin Decl. ¶ 6, Ex. 5.)

Plaintiffs' first amended complaint in this case asserts 11 claims: (1) false advertising under 15 U.S.C. § 1125(a) (Lanham Act); (2) Unfair competition under 15 U.S.C. § 1125(a) (Lanham Act); (3) "Product Disparagement/Trade Libel"; (4) tortious interference; (5) unfair competition under the Washington Consumer Protection Act ("CPA"); (6) privacy violations under the CPA; (7) intentional infliction of emotional distress ("IIED") or negligent infliction of emotional distress ("NIED"); (8) defamation; (9) false light; (10) declaratory judgment of patent noninfringement; and (11) declaratory judgment of patent invalidity. (Compl. ¶¶ 107-88.) The court has already dismissed Plaintiffs' patent claims, Counts 10 and 11. (*See* 10/20/17 Order (Dkt. # 32) at 37.) Defendants now move for summary judgment on all of Plaintiffs' remaining claims.

//

//

//

# III.    ANALYSIS

## A.    Summary Judgment Standard

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007)

(internal quotation marks and citation omitted).  The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.  However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

**B.      Motion to Strike Mr. Royce's Declaration**

RED moves to strike Mr. Royce's declaration "because it fails to establish that [Mr.] Royce had any first-hand knowledge of the matters he attests to as 'facts' and cannot create a genuine dispute of material facts on such topics."  (*See* Reply at 2 (citing Fed. R. Evid. 602).)  RED contends that Mr. Royce's declaration makes statements regarding RED's "internal engineering, development, and financial matters, as well as its motivations, strategies, and knowledge," about all of which Mr. Royce lacks personal knowledge."  (*See id.*)  RED also moves to strike Exhibits 1 and 3 to Mr. Royce's declaration under Federal Rules of Evidence 403, 106, 801, 802, and 901.  (*See* Reply at 3-4.)

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  "Evidence to prove personal knowledge may consist of the witness's own testimony."  *Id.*  The majority of Mr. Royce's declaration consists of statements made

with personal knowledge.  For example, Mr. Royce testifies to his knowledge of the fact of the internet postings that underlie Plaintiffs' claims and portions of RED's website (*see, e.g.*, Royce Decl. ¶¶ 23-24) and submits photographic evidence of the internal components and storage capacity of the Mini-Mag (*see id.* ¶¶ 32, 35, Exs. 3-4).  Because the statements in Mr. Royce's declaration are largely made with personal knowledge, the court DENIES Defendants' motion to strike Mr. Royce's declaration.  However, should any specific statement in Mr. Royce's declaration be unsupported by personal knowledge, the court will disregard such statements in the discussion to follow.

**C.  Defendants' Summary Judgment Motion**

Defendants move for summary judgment on all of Plaintiffs' remaining claims. The court GRANTS in part and DENIES in part the motion as set forth below.

1.  Attribution of Mr. Land's Statements to RED

Defendants argue, in the span of three paragraphs, Mr. Land's statements on Reduser.net or Facebook are not attributable to RED and therefore cannot be the basis of claims against RED.  (*See* MSJ at 11.)  Defendants cite only one case for the proposition that RED does not have a duty to monitor and remove offensive posts from Reduser.net. (*See id.* (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)).)  That is beside the point, however, because Mr. Land's posts on Reduser.net are made in his capacity as the president, shareholder, and most senior employee of RED.  Mr. Land's posts give updates on RED's litigation against Jinni Tech, discuss RED product manufacturing, sourcing, and testing, discusses RED's costs, and refers to RED as "our" and "we."  (*See, e.g.*, Royce Decl. ¶ 3, Ex. 2; Forum Posts at JT001357-58.)  Defendants cite no authority

to support the contention that RED's president and sole shareholder was not acting on behalf of RED when he made these statements. Accordingly, the court does not consider Defendants' argument on this point any further.

## 2. Lanham Act Claims

Jinni Tech's unfair competition and false advertising claims are both based on the Lanham Act, 15 U.S.C. § 1125(a).[3] (*See* FAC ¶¶ 107-15.) 15 U.S.C. § 1125 "allows one competitor to sue another if it alleges unfair competition arising from false or misleading product descriptions." *See Pom Wonderful LLC v. The Coca-Cola Co.*, 573 U.S. 102, 106 (2014). The cause of action the Act creates imposes civil liability on any person who "uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U. S. C. §1125(a)(1). The elements of this claim are (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to

//

---

[3] 15 U.S.C. § 1125(a) codifies Section 43(a) of the Lanham Act. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Plaintiffs categorize their unfair competition and false advertising claims as two distinct claims. (*See* FAC ¶¶ 107-15.) However, both claims fall under the same legal standard and the court analyzes them together. *See* 5 McCarthy on Trademarks and Unfair Competition § 27:53 (5th ed.) (noting that courts apply the same test to determine whether the claim is based on the defendant's goods and services or the plaintiff's goods and services).

influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012); *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citing *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)).

"Statements of opinion," as opposed to statements of fact, "are not generally actionable under the Lanham Act." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). "Whether an allegedly defamatory statement is one of opinion or fact is a question of law." *Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir. 2009). Courts in this circuit apply a three part test to make this determination, and analyze: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates the impression, and (3) whether the statement in question is susceptible of being proved true or false." *Id.* at 987.

"To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *See id.* "Only an unambiguous message can be literally false." *See Nutrition Distribution LLC v. PEP Research, LLC*, No. 16CV2328-WQH-BLM, 2019 WL 652391, at *4 (S.D. Cal. Feb. 15, 2019) (quoting *Novartis Consumer Health v. Johnson & Johnson*, 290 F.3d

578, 588 (3d Cir. 2002)).  If a statement is literally false, courts presume there is

deception and the plaintiff need not prove how buyers perceive it.  *See Time Warner*

*Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007).  If a statement is true,

the plaintiff must provide additional evidence that the statement "is nevertheless likely to

mislead or confuse consumers."  *Id.*  Reactions of the public to determine whether a

literally true statement misleads customers are typically tested through the use of

consumer surveys.  *Southland Sod Farms*, 108 F.3d at 1139.  To survive summary

judgment, a plaintiff must provide admissible evidence of literal falsity or customer

confusion beyond self-serving conclusory statements.  *See Schering–Plough Healthcare*

*Prods. v. Schwarz Pharma*, 586 F.3d 500, 513 (7th Cir. 2009) ("[The plaintiff] cannot

just intone 'literal falsity' and by doing so prove a violation of the Lanham Act.").

Defendants argue they are entitled to summary judgment on Jinni Tech's Lanham

Act claims because the statements at issue were either literally true, substantially true, or

not actionable assertions of fact.  (*See* MSJ at 10.)

a.  *"We developed our own IP and Firmware"*

Mr. Land made this statement in a forum post on Reduser.net on July 31, 2016.[4]

(*See* FAC ¶ 50; Forum Posts at JT001358.)  RED asserts that statements that RED

develops customized hardware and software for its RED SSD media accessories are

//

---

[4] Plaintiffs' first amended complaint also alleges that in a subsequent post dated August 4, 2020, Mr. Land states that "we make custom firmware specific to the cards and we have a pretty extensive QC and our development on media is pretty insane and go[es] through many, many, many years of testing with a lot of engineers to pass all our media . . ."  (FAC ¶ 51.) However, this August 4, 2020, post does not appear in the record.  (*See generally* Dkt.)

1   literally true. (*See* MSJ at 13 (citing RED Dep. at 58:2-16, 97:14-99:23) ("Q: Wait, now.

2   Are you saying that you tell Micron to put custom firmware on these cards before they

3   supply them to you? A: Yes."))). RED further asserts that the fact that Mr. Royce could

4   not source all of the hardware and firmware for the Jinni Mag off-the-shelf "proves that

5   RED's Mini-Mag uses customized hardware and firmware." (*See* MSJ at 13.) For

6   example, although Mr. Royce used some off-the-shelf components to create the Jinni

7   Mag, he also testified that he "made [his] own pass-through adaptor . . . And I 3D-printed

8   a casing for them." (*See id.* (quoting Rankin Decl. ¶ 5, Ex. 4 ("Royce Dep.") at

9   72:23-73:1).) Mr. Royce also had to "copy" some "random characters" in the

10  Mini-Mag's software code because "without them the camera cripples itself." (*See*

11  Royce Dep. at 76:20-78:7.)

12          In response, Plaintiffs assert that the "primary component" of the Mini-Mag is the

13  SSD, that Mini-Mag uses generic SSDs RED purchases, that tests and verifications on

14  RED-branded SSDs are done by the original SSD manufacturer, and that RED "added

15  nothing of material value to this commonly used SSD storage device." (*See* Resp. at 6.)

16  Further, Jinni Tech asserts that RED "cannot even define the imaginary 'custom'

17  firmware and was not able to indicate what this firmware is, where in the SSD this

18  firmware resides or how this 'customized' firmware processes the information differently

19  from other generic SSDs." (*See id.*)

20          Plaintiffs also rely on a Reduser.net forum post by Mr. Land, which states that

21  RED is not trying to pretend that the SSDs are "magic fairy tales," but states that their

22  higher cost "is because the R&D expense of the development of custom firmware (and

yes I mean camera firmware to write to the cards), the testing, and the support all that

gets amortized into them.  And yes, Micron gives us cards with special code on them.

From Micron.  You need to copy that code from our Mini Mags onto whatever else to

spoof it."  (*See id.*)

Statements that RED "developed [its] own IP and firmware" are ambiguous—and,

as such, cannot be literally false—given the evidence before the court.  *See Nutrition*

*Distribution LLC*, 2019 WL 652391, at *4.  Although Plaintiffs provide evidence that

RED's SSDs are standard-issue, Mr. Royce's testimony about the steps he had to take to

create the JinniMag, including "copying" some "random characters," suggests that RED's

Mini-Mag product as a whole may include hardware and/or software created specifically

by RED.  Moreover, neither party submits expert testimony that might clarify the issue.

*See* 5 McCarthy on Trademarks and Unfair Competition § 27:56 (5th ed.) ("If the

advertising involves medical, scientific, or technical matters, expert witnesses will be

necessary to unravel truth from falsity.")

Because these statements are ambiguous, Plaintiffs are required to prove either

that Defendants intended to mislead customers or that the statements "actually deceived

or ha[ve] the tendency to deceive a substantial segment of [their] audience."  *Southland*

*Sod Farms*, 108 F.3d at 1139.  Plaintiffs submit no evidence of intent or of a customer

confusion survey.  (*See generally* Resp.; Dkt.)  Moreover, there is no evidence in the

record from any consumer that relied on this statement in making its purchasing decision.

(*See generally* Dkt.)

//

Therefore, Plaintiffs fail to submit evidence that creates a genuine dispute of material fact regarding the falsity of the statements that RED developed its own IP and firmware. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Lanham Act claims as they relate to Mr. Land's statements that RED developed its own IP and firmware.[5]

> b. RED *"spent millions of dollars testing, certifying and QC every media card that we ship. It's why we have significantly less card errors than other companies using generic media . . . even reputable generic media."*

Mr. Land made this statement in a Reduser.net forum post on July 31, 2016. (*See* FAC ¶ 50; Forum Posts at JT001358.) This statement is not ambiguous and can be tested by direct comparison to evidence regarding the amount of money RED spent and data on card errors. RED contends the statement is "literally true." (*See* MSJ at 14 (citing 2d Land Decl. ("Research and Development and Quality Control costs easily exceed a million dollars.").) Neither party submits documentary evidence of RED's expenditures or the Mini-Mag's card error rates. (*See generally* MSJ; Resp.) Nevertheless, Plaintiffs contend that RED could not have spent millions of dollars testing and certifying its media cards because "[t]he SSD inside the R[ED-]branded memory storage device is nothing //

---

[5] Defendants also move for summary judgment on an apparent allegation from Plaintiffs that "RED owns patents in the technology used in its RED SSD media that is infringed by other companies who make RED-compatible SSD media." (*See* MSJ at 14.) Plaintiffs oppose Defendants' motion based on the same apparent allegation. (*See* Resp. at 4 ("R[ED]'s allegation that Jinni [Tech] stole R[ED]'s IP and infringed Red's patent is false.").) However, neither party presents evidence of the specific statement or statements to which they refer. (*See generally* MSJ.; Resp.) Mr. Land's Reduser.net posts reference RED's "IP," but do not specifically mention RED's patents. (*See* Forum Posts at JT001360-63.) The court cannot adjudicate an argument in favor of summary judgment based on the veracity of a statement without evidence of that statement.

more than an off-the-shelf generic SSD with standard manufacturer firmware." (Royce Decl. ¶ 6.)  In response to that argument, Defendants contend that "[t]he mSATA SSD is one component that goes into the RED Mini-Mag, along with several other commercially available and custom-made components." (*See* Reply at 6 (citing 2d Land Decl. ¶ 2).) Further, Mr. Land testifies that RED's research and development and quality control costs "easily exceed a million dollars." (*See* 2d Land Decl. ¶ 5.)

RED's expenditures should have been provable through document discovery. Nevertheless, Mr. Royce's and Mr. Land's testimony combine to create a genuine dispute of material fact regarding whether RED did (or even could have) spent "spent millions of dollars testing, certifying and QC every media card."  Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' Lanham Act claims as they pertain to RED's expenditures on testing and certifying its media cards.

> c. *Allegedly False Marketing of RED SSD media as made in the United States*

Plaintiffs submit an image of a RED Mini-Mag that states "MADE IN USA," and an SSD card (presumably retrieved from inside the Mini Mag) that states "Product of SINGAPORE."  (*See* Royce Decl. ¶ 4, Ex. 3.)  Plaintiffs contend, based on this image, that Defendants misrepresent the geographic origin of their products.  (*See* MSJ Resp. at 14.)  A plaintiff bringing a Lanham Act unfair competition claim based on a "Made in the USA" designation must show the designation is literally false or misleading to the public. *See Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 987 (D. Minn. 2014).

//

In support of its summary judgment motion, RED does not appear to dispute the veracity of the image but presents declaration testimony from Mr. Land that "[a]lthough the Mini-Mag does contain some foreign components, RED products are primarily manufactured in California." (*See* MSJ at 15 (citing Land Decl. ¶¶ 5, 8).) Therefore, the court concludes that truth or falsity of the "Made in USA" label is ambiguous in that it is unclear as to whether the statement refers to the entire Mini-Mag product or simply the component on which it is printed. Plaintiffs bear the burden to submit evidence that the ambiguous label "actually deceived or has the tendency to deceive a substantial segment of its audience." *Southland Sod Farms*, 108 F.3d at 1139. As Plaintiffs provide no such evidence, Plaintiffs have failed to create a genuine dispute of material fact, and Defendants are entitled to summary judgment on Plaintiffs' Lanham Act claim as it relates to the Mini-Mag's "MADE IN USA" label.

   d.   *Allegedly false marketing of RED's 480GB SSD media as 512GB SSD media.*

  RED admits that it markets its 512 gigabyte SSD media as having a capacity of 512 gigabytes of storage space. (*See* MSJ at 15.) Defendants contend that the dichotomy between actual storage capacity and useable storage capacity is "widely known throughout the industry and RED's marketing is consistent with industry standards and consumer expectations for digital storage media." *See id.* Defendants, however, cite to no evidence in support of industry standards or consumer expectations. At most, Defendants submit the result of a Google search for "512gb ssd [*sic*] actual capacity" that

//

returns primarily results that explain that a 512 gigabyte SSD "will contain between 476 and 490 [gigabytes] of useable storage space." (*See id.* (citing Rankin Decl. ¶ 10, Ex. 9).)

Plaintiffs respond that RED's "512GB" SSD cards are misleading beyond the actual storage-useable storage distinction, because the cards in fact only contain 447 gigabytes of useable storage capacity, and they were in fact simply relabeled 480 gigabyte SSD cards obtained from Micron. (*See* Resp. at 15 (citing Royce Decl. ¶ 35, Ex. 4 (screenshot showing the "Size" and "Size Available" as "447.1 GB")).)

In contrast to the other statements at issue in Plaintiffs' Lanham Act claims, neither party submits evidence showing the specific statements RED makes when it markets its SSD cards as having a capacity of 512 gigabytes of storage space. (*See generally* MSJ.; Resp.; Reply.) Without that evidence, the court is unable to determine whether any specific statement is ambiguous or not, and therefore whether Plaintiffs are required to submit evidence of customer confusion. Given this lack of evidence, Defendants have not met their burden to produce evidence negating an element of Plaintiffs' claim and are not entitled to summary judgment on Plaintiffs' claim as it pertains to RED's marketing of the storage capacity of its SSD cards.

> *e.* *Statements identifying Jinni Tech and the JinniMag as a "scam" and Jinni Tech as a "criminal," "hacker" and "pirate."*

The statements made referring to the JinniMag as a "scam" and asserting that Jinni Tech was engaging in "criminal behavior" were not made by Mr. Land, but rather by other Reduser.net users. *See* Forum Posts at JT001350-53. No evidence in the record suggests these users are employed by or affiliated with RED, other than the fact that they

use RED products.  *See id.*  As these statements cannot be attributed to Defendants, Defendants are entitled to summary judgment on Plaintiffs' Lanham Act claims as they pertain to statements that the JinniMag is a "scam" or that Jinni Tech is a "criminal," "hacker," or "pirate."

   3.  <u>Defamation and Product Disparagement / Trade Libel</u>

Jinni Tech's trade libel claim and Mr. Royce's defamation claim against Defendants are based on substantially the same allegations that form the basis of Plaintiffs' Lanham Act claims against defendants; namely, Mr. Land's allegedly false or misleading statements in internet forums about Jinni Tech and Mr. Royce.  (*See* FAC ¶¶ 166-73.)

Under Washington law, to avoid summary judgment on a defamation claim, a plaintiff must make a prima facie showing of facts that would raise a genuine issue of material fact as to each of the following elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) that the communication proximately caused damages.  *Mark v. Seattle Times*, 635 P.2d 1081, 1089 (Wash. 1981); *see also Mohr v. Grant*, 108 P.3d 768, 776 (Wash. 2005).  A plaintiff must establish each element "by evidence of convincing clarity."  *Mark*, 635 P.2d at 1089.

To establish the first element of defamation, "the plaintiff must show the statement is provably false, either in a false statement or because it leaves a false impression."  *Mohr*, 108 P.3d at 775.  Washington courts do "not require a defamation defendant to prove the literal truth of every claimed defamatory statement."  *Id.* at 775.  Rather, "[a] defendant need only show that the statement is substantially true or that

the gist of the story, the portion that carries the 'sting,' is true." *Id.* (quoting *Mark*, 635 P.2d at 1092). "The 'sting' of a report is defined as the gist or substance of a report when considered as a whole." *Id.* (quoting *Herron v. King Broadcasting*, 776 P.2d 98, 102 (Wash. 1989). "Where a report contains a mixture of true and false statements, a false statement (or statements) affects the 'sting' of a report only when 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood." *Herron*, 776 P.2d at 102.

The tort of trade libel is "substantively similar to defamation." *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 820 (9th Cir. 1995). "To establish a claim of product disparagement, also known as trade libel, a plaintiff must allege that the defendant published a knowingly false statement harmful to the interests of another and intended such publication to harm the plaintiff's pecuniary interests." *Id.* (citing Restatement (Second) of Torts § 623A (Am. Law Inst. 1977)).

The court has already determined that Defendants are not entitled to summary judgment on Plaintiffs' Lanham Act claims with respect to Mr. Land's statements regarding RED's expenditures on testing, and the storage capacity of RED's SSD media cards, and on the "Made in USA" designation on RED's Mini-Mags. (*See supra* § III.C.2.) However, those statements do not reference Mr. Royce or Jinni Tech, and are therefore not actionable as a defamation or trade libel claim. Moreover, the allegedly defamatory statements made referring to the JinniMag as a "scam" and asserting that Jinni Tech was engaging in "criminal behavior" were not made by Mr. Land, but rather by other Reduser.net users for whom no evidence suggests they are employed by or

affiliated with RED, other than the fact that they use RED products.  *See* Forum Posts at JT001350-53.  Therefore, Jinni Tech has not pointed the court to any of Defendants' statements about Jinni Tech for which there is a genuine dispute of material fact that can sustain a defamation or trade libel claim.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' defamation and trade libel claims.

### 4.  Tortious Interference

Plaintiffs allege that Defendants are liable for tortious interference based on the same statements Defendants made about Plaintiffs discussed above.  (*See* FAC ¶ 138.)  In their complaint, Plaintiffs allege that "[c]ustomers who preordered the JinniMag canceled their orders after reading RED's and Mr. Land's messages on Facebook and [R]eduser.net.  Other interested customers were deterred from placing orders."  (*See id.* ¶ 140.)

"To prove tortious interference, the plaintiff must produce evidence sufficient to support all the following findings: (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of and intentional interference with that relationship or expectancy; (3) a breach or termination of that relationship or expectancy induced or caused by the interference; (4) an improper purpose or the use of improper means by the defendant that caused the interference; and (5) resultant damage."  *Tamosaitis v. Bechtel Nat'l, Inc.*, 327 P.3d 1309, 1313 (Wash. Ct. App. 2014) (quoting *Eugster v. City of Spokane*, 91 P.3d 117, 123 (Wash. Ct. App. 2004)).  Although differences exist, the legal standards for tortious interference with contract and tortious interference with a business expectancy or relationship largely overlap.  *Compare* Wash.

Pattern Jury Instr. Civ. WPI 352.01 (7th ed. July 2019) *with* Wash. Pattern Jury Instr. Civ. WPI 352.02 (7th ed. July 2019).

Exercising one's legal interest in good faith is not improper interference. *Elcon Const., Inc. v. E. Washington Univ.*, 273 P.3d 965, 971 (Wash. 2012). However, unlike defamation, a plaintiff need not prove falsity to prevail on a tortious interference claim. Defendants do not discuss Plaintiffs' tortious interference claim aside from asserting that Defendants are entitled to summary judgment on that claim for the same reason that they are entitled to summary judgment on Plaintiffs' Lanham Act and defamation claims— namely, that Mr. Land's alleged statements about Jinni Tech are not false. (*See generally* MSJ.)

However, because falsity is not a required element of tortious interference, Defendants have not carried their burden to 1) produce evidence negating an essential element of the nonmoving party's case, or 2) show that the nonmoving party lacks evidence of an essential element of its claim or defense, *see Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106, and are not entitled to summary judgment on Plaintiffs' tortious interference claim.

5.  False Light

"False light differs from defamation in that it focuses on compensation for mental suffering, rather than reputation." *Corey v. Pierce Cty.*, 225 P.3d 367, 373 (Wash. Ct. App. 2010). "[L]ike defamation, false light claims require a showing of falsity and knowledge of, or reckless disregard for that falsity." *Id.* As discussed above, Plaintiffs do not submit evidence capable of creating a genuine dispute of material fact that

Defendants made false statements about Plaintiffs. *See supra* § III.C.2. Moreover, Plaintiffs submit no evidence of Mr. Royce's mental suffering. *See infra* § III.C.6. Therefore, Defendants are entitled to summary judgment on Plaintiffs' claim for false light.

### 6. IIED and NIED

Plaintiffs' claims for IIED and NIED are brought on behalf of Mr. Royce individually. (*See* FAC ¶¶ 158-64.)

#### a. IIED

The burden of proof on an IIED claim is stringent. *See Lyons v. U.S. Bank Nat. Ass'n*, 336 P.3d 1142, 1151 (Wash. 2014). To prevail on an IIED claim, "a plaintiff must prove (1) outrageous and extreme conduct by the defendant, (2) the defendant's intentional or reckless disregard of the probability of causing emotional distress, and (3) actual result to the plaintiff of severe emotional distress." *Steinbock v. Ferry Cty. Pub. Util. Dist. No. 1*, 269 P.3d 275, 282 (Wash. Ct. App. 2011).

"The first element requires proof that the conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Lyons*, 336 P.3d at 1151 (quoting *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002); *Dicomes v. State*, 782 P.2d 1002, 1012 (Wash. 1989)). "The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Id.* (quoting *Dicomes*, 782 P.2d at 1013.) Similarly, "[i]t is

for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Id.* (quoting Restatement (Second) of Torts § 46 (Am. Law Inst. 1965)).

Plaintiffs point to no "outrageous and extreme conduct" that goes beyond mere insults and reaches the level of "utterly intolerable in a civilized community." (*See generally* Resp.); *Lyons*, 336 P.3d at 1151 (quoting *Robel*, 59 P.3d at 619). Moreover, Plaintiffs submit no evidence of emotional distress. (*See generally id.*; Royce Decl.) Therefore, Defendants are entitled to summary judgment on Plaintiffs' IIED claim.

### b. NIED

Negligent infliction of emotional distress is a narrowly construed tort under which a plaintiff must prove (1) that he or she suffered emotional distress that is within the scope of foreseeable harm of the negligent conduct, (2) the plaintiff reasonably reacted given the circumstances, and (3) objective symptomatology confirms the distress." *Repin v. State*, 392 P.3d 1174, 1184 (Wash. Ct. App. 2017) (citing *Bylsma*, 293 P.3d at 1170-71)). "[T]o satisfy the objective symptomology requirement . . . a plaintiff's emotional distress must be susceptible to medical diagnosis and proved through medical evidence." *Hegel v. McMahon*, 960 P.2d 424, 431 (Wash. 1998). The plaintiff must provide "objective evidence regarding the severity of the distress, and the causal link between the observation at the scene and the subsequent emotional reaction." *Id.*

Mr. Royce fails provides no objective medical evidence regarding the severity of his distress or a causal link between his distress and Defendants' actions. Accordingly, Defendants are entitled to summary judgment on Mr. Royce's NIED claim.

1          7.   Unfair Competition under the CPA

2          Plaintiffs' claim under the CPA is based on the same alleged facts that underlie

3   Plaintiffs' Lanham Act unfair competition claims.  (*See* FAC ¶ 144 (asserting that "the

4   acts described above" violate the CPA).)  The elements of a CPA action are "(1) unfair or

5   deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact;

6   (4) injury to plaintiff in his or her business or property; [and] (5) causation."  *Bain v.*

7   *Metro. Mortg. Grp., Inc.*, 285 P.3d 34 (Wash. 2012).  Courts considering CPA claims

8   must take guidance from "final decisions of the federal courts . . . interpreting the various

9   federal statutes dealing with the same or similar matters."  RCW 19.86.920.  The CPA

10  "shall be liberally construed that its beneficial purposes may be served."  RCW

11  19.86.920.  *Id.*

12          "[T]here is no question that false advertising within the scope of the Lanham Act

13  (except perhaps for its interstate commerce requirement) is an unfair or deceptive practice

14  within the scope of the CPA."  *CertainTeed Corp. v. Seattle Roof Brokers*, No. C 09-563

15  RAJ, 2010 WL 2640083, at *6 (W.D. Wash. June 28, 2010).  Accordingly, Defendants

16  are not entitled to summary judgment on Plaintiffs' CPA claims as they pertain to RED's

17  expenditures on testing and certifying its media cards, the "Made in USA" designations,

18  or statements about the storage capacity of RED's products.  However, for the reasons

19  stated above, Defendants are entitled to summary judgment on the remainder of

20  Plaintiffs' CPA claim.  *See supra* § III.C.2 (discussing Defendants' entitlement to

21  summary judgment on the same grounds on Plaintiffs' analogous Lanham Act claim).

22  //

1    8.  <u>Privacy Violations under RCW 9.73.060</u>

2    Defendants move for summary judgment on Plaintiffs' claim under RCW

3    9.73.060.  RCW 9.73.060 provides a private right of action for violations of the

4    provisions of RCW Chapter 9.73.  *See* RCW 9.73.060.  Defendants contend that

5    Plaintiffs' sole privacy claim is based on posts by Reduser.net users that revealed Mr.

6    Royce's personal address and phone number, and that such a claim is not actionable

7    under RCW 9.73.060.  (*See* MSJ at 26; *see also* FAC ¶¶ 151-152.)  Plaintiffs did not

8    respond to Defendants' arguments on this claim, and Plaintiffs' response does not even

9    mention the words "privacy," "address," or any variation of "telephone number."  (*See*

10   *generally* Resp.)

11   By its plain language, RCW 9.73.060 does not provide a cause of action for

12   alleged privacy violations beyond those expressly set forth in RCW Chapter 9.73.  *See*

13   RCW 9.73.060.  Those provisions address the interception of communications.  *See, e.g.*,

14   RCW 9.73.030 (addressing "[i]ntercepting, recording, or divulging private

15   communication"); RCW 9.73.040 (providing an exception by court order under certain

16   circumstances); *see also State v. Gunwall*, 720 P.2d 808, 817 (Wash. 1986) ("We further

17   note that pursuant to RCW 9.73.060, a party may sue for damages because of an unlawful

18   intercept.").

19   Putting aside that the alleged postings were not made by Defendants, the court

20   finds no evidence in the record that creates a genuine dispute of fact that any posts were

21   the result of an intercepted, recorded, or divulged communication.  (*See generally* Dkt.)

22   //

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' privacy claim under RCW 9.73.060.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendants' motion for summary judgment (Dkt. # 79) as follows:

- The court DENIES Defendants' summary judgment motion with respect to Plaintiffs' Lanham Act and Washington Consumer Protection Act claims based on statements related to RED's expenditures on testing and certifying its media cards, RED's country of origin designations on its products, and the storage capacity of RED's SSD media cards;

- The court DENIES Defendants' summary judgment motion with respect to Plaintiffs' claim for tortious interference; and

- The court GRANTS Defendants' summary judgment motion in all other respects.

Dated this 9th day of April, 2020.

JAMES L. ROBART
United States District Judge