UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JINNI TECH, LTD., et al.,

                     Plaintiffs,

      v.

RED.COM, INC., et al.,

                  Defendants.

CASE NO. C17-0217JLR

AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Before the court is Red.com, Inc. and Red.com, LLC's (collectively, "Defendants" or "RED") motion for summary judgment.  (MSJ (Dkt. # 79).) Plaintiffs Jinni Tech, Ltd. ("Jinni Tech") and Bruce Royce (collectively, "Plaintiffs") oppose the motion.  (Resp. (Dkt. # 85).)  The court has considered the motion, the parties' submissions in support of and in opposition to the motion, the relevant portions of the record, and the applicable

//

//

1  law.  Being fully advised,[1] the court GRANTS in part and DENIES in part Defendants'

2  motion for summary judgment as set forth below.

## II.   BACKGROUND

**A.   Factual Background**

1. The Mini-Mag and JinniMag

RED manufactures high-end digital cameras used to create motion pictures.  (*See* 2d Land Decl. (Dkt. # 80) ¶ 2.)  RED claims to produce an "ecosystem comprised of everything from the image capture at the sensors through the camera and its processes to generate and output compressed RAW image files to storage media."  (*See id.*)  As part of this "ecosystem," RED produces solid-state drives ("SSDs") that RED markets as "Mini-Mag."  (*Id.*)  The Mini-Mags store the camera's digitally compressed RAW recordings until they can be downloaded onto computers for movie post-production.  (*See id.*; Rankin Decl. (Dkt. # 81) ¶ 2, Ex. 1 ("RED Dep.") at 103:8-104:1.)  RED claims that its cameras are designed such that without RED firmware in a connected SSD (such as a Mini-Mag), the RED camera's operating software system cannot properly communicate with a memory card and thus the system will not function.  (*See* RED Dep. At 42:16-44:8; 2nd Land Decl. ¶ 3.)

In 2016, Mr. Royce's company, Jinni Tech launched for sale an SSD designed for use with RED's cameras that it called the "JinniMag."  (*See* MSJ at 6; Royce Decl. (Dkt. # 86) ¶ 2.)  Jinni Tech identified the JinniMags on the "RED Scarlet-W Facebook group"

---

[1] Neither party requests oral argument (*see* MSJ at 1; Resp. at 1), and the court finds oral argument unhelpful to its disposition of the motion, *see* Local Rules LCR 7(b)(4).

as "Affordable, Fully Compatible Red Mags."  (*See* MSJ at 6; FAC (Dkt. # 10) ¶ 67.)

Jinni Tech claims that the JinniMag was an attempt to "break R[ED]'s monopoly on

memory storage devices for RED cameras."  (*See* Resp. at 2.)  According to Jinni Tech,

RED-branded storage devices "have the same standard features of a generic SSD memory

device."  (Royce Decl. ¶ 3.)  By designing its system to work only with RED-branded

SSDs, Jinni Tech asserts that RED forces its users to buy RED's storage devices

containing generic SSD cards at premium prices, "allowing R[ED] to price gauge their

customers in the process."  (*See id*.)

    2.  Online Statements

    Soon after Jinni Tech announced the JinniMag, it became a topic of conversation

in the online forums on Reduser.net, a "social media platform" on which RED users

discuss RED equipment.  (*See* 1st Land Decl. (Dkt. # 17) ¶ 4.)  Landmine Media, Inc.

("Landmine"), a Colorado corporation of which Jarred Land is a part owner, operates

Reduser.net.  (*See id.*)  A Reduser.net user created a thread titled "Cheap third party Red

MiniMag replacement – JinniMag?" on in which several users made the following

comments, among others:

> To offer licensing out to 3rd parties seemed unlikely, and yet, these new
> JinniMags ads have the Red logo right on them . . . Has Red endorsed this,
> or is this a lawsuit in the making? . . . EDIT:  Thanks Phil for the info.
> Apparently this is a scam.
>
> Doesn't RED use a proprietary interface?
>
> Buying any electronic non-authorized 3rd party product for a RED camera is
> a VERY bad idea . . . Do NOT waste your money – you will be sorry.

//

ORDER - 3

> What I read there doesn't sound like the best way to introduce yourself as the producer of a product that probably violates patents, copyrights and what not. Copying things is not making things, everyone knows and see's [sic] that.

(Rankin Decl. ¶ 7, Ex. 6 ("Forum Posts") at JT001350-53.)  On July 31, 2016,

Jarred Land, the president of Red.com, Inc., made the following post:

> Guys… I can't tell you how much this pisses me off.  Not from a business perspective, but as a patent holder and creator.  Like all of you, we spend a lot of time money and effort creating what we do.  For our media, we developed our own IP and Firmware and spent millions of dollars testing, certifying and [running quality control ("QC") on] every media card that we ship.  Its [sic] why we have significantly less card errors than other companies using generic media… even reputable generic media.  Media is one of the most critical components of the entire system and the way we write to a card is very different than a normal SSD is programmed for.  For some random company to hack and duplicate our IP and our firmware (which is the only way they could do this) is exactly like someone stealing your films and calling them their own and selling them to others.  It goes against everything I stand for.  I don't know where this company is from.  I assume the UK cover is just bullshit.  Someone said China but I really hope this is not the case as China has made such significant improvements over the last decade turning around their attitude towards Copyright infringement, Trademark violations, and IP theft (which it appears this company has broken all three in one swoop)[.]  I am shocked some of you are here are [sic] actually endorsing this.  I will shut RED completely down… I am not kidding… [i]f stealing each other[']s shit suddenly is deemed acceptable.  It's not a world I want to work or create or live in.

(Forum Posts at JT001357-58.)  Several posts supportive of Mr. Land followed, including

the following:

> These cheap knock off SSDs are clearly engaging in criminal behavior.  Not OK.

> Disappointing and not cool.

> Saw this on [Facebook] and thought maybe it was a third-party licensing deal.  Definitely won't be looking into it anymore since, according to Jarred, they just ripped the RED Mag off completely.  Idiots.

(Forum Posts at JT001360-63.)  Mr. Land then made a second post on August 1, 2016, that included in part the following:  "Lawyers will deal with these guys doing this…. But it is you guys that think that this is OK that have me way way way more pissed off[.]" (Forum Posts at JT001364-65.)

A similar thread on Facebook also started on July 31, 2016, started by Facebook user Behrooz Modirrousta.  (Rankin Decl. ¶ 8, Ex. 7 ("Facebook Posts").)  Mr. Land also posted on this Facebook thread as follows:

> This is not legit . . . not certified … not endorsed and will never be because its [*sic*] bullshit.  Even if this was real there are too many inaccuracies and violations going on here to list but I figure you all are smart enough to see through this.

(Facebook Posts at JT001453.)

Mr. Land's above statements on Reduser.net and on Facebook form the basis of several of Jinni Tech's claims in this lawsuit.  According to Jinni Tech, Mr. Land "never took any steps to discourage RED users from making these vicious, personal attacks against Mr. Royce," Jinni Tech's owner.  (*See* FAC ¶ 95.)  Jinni Tech alleges that these statements "caused serious damage to Mr. Royce's professional reputation" and caused Mr. Royce and his family "serious emotional distress, anxiety, and stress, resulting in harm to Mr. Royce's emotional and physical health, including severe physical pain and a sleep disorder."  (*Id.* ¶¶ 97-98.)[2]

---

[2] Plaintiffs allege in their first amended complaint that "[w]ith Defendants' knowledge and encouragement, RED's users posted Mr. Royce's personal information on Facebook for hundreds of thousands of users to view."  (FAC ¶ 161.)  However, in response to Defendants' motion for summary judgment, Plaintiffs submit no evidence of these Facebook posts and no evidence of any ill effects of such posts on Mr. Royce.  (*See generally* Resp.; Royce Decl.)

1    **B.     Procedural Background**

2          Prior to this lawsuit, RED sued Jinni Tech for patent and trademark infringement,

3    false advertising, unfair competition, unjust enrichment, and breach of contract in the

4    United States District Court for the Central District of California.  (*See* Rankin Decl. ¶ 9,

5    Ex. 8.)  Jinni Tech subsequently filed suit against RED on February 10, 2017, in this

6    court.  (*See* Compl. (Dkt. # 1).)  RED subsequently learned through discovery that Jinni

7    Tech "would likely be unable to pay any meaningful damages award should RED

8    prevail" and voluntarily dismissed its lawsuit without prejudice.  (*See* Rankin Decl. ¶ 6,

9    Ex. 5.)

10         Plaintiffs' first amended complaint in this case asserts 11 claims:  (1) false

11   advertising under 15 U.S.C. § 1125(a) (Lanham Act); (2) Unfair competition under 15

12   U.S.C. § 1125(a) (Lanham Act); (3) "Product Disparagement/Trade Libel"; (4) tortious

13   interference; (5) unfair competition under the Washington Consumer Protection Act

14   ("CPA"); (6) privacy violations under the CPA; (7) intentional infliction of emotional

15   distress ("IIED") or negligent infliction of emotional distress ("NIED"); (8) defamation;

16   (9) false light; (10) declaratory judgment of patent noninfringement; and (11) declaratory

17   judgment of patent invalidity.  (Compl. ¶¶ 107-88.)  The court has already dismissed

18   Plaintiffs' patent claims, Counts 10 and 11.  (*See* 10/20/17 Order (Dkt. # 32) at 37.)

19   Defendants now move for summary judgment on all of Plaintiffs' remaining claims.

20   //

21   //

22   //

# III.    ANALYSIS

## A.    Summary Judgment Standard

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007)

1   (internal quotation marks and citation omitted).  The court may not weigh evidence or

2   make credibility determinations in analyzing a motion for summary judgment because

3   those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.  However,

4   the nonmoving party "must do more than simply show that there is some metaphysical

5   doubt as to the material facts . . . .  Where the record taken as a whole could not lead a

6   rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

7   *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec.*

8   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

9   **B.    Motion to Strike Mr. Royce's Declaration**

10          RED moves to strike Mr. Royce's declaration "because it fails to establish that

11  [Mr.] Royce had any first-hand knowledge of the matters he attests to as 'facts' and

12  cannot create a genuine dispute of material facts on such topics."  (*See* Reply at 2 (citing

13  Fed. R. Evid. 602).)  RED contends that Mr. Royce's declaration makes statements

14  regarding RED's "internal engineering, development, and financial matters, as well as its

15  motivations, strategies, and knowledge," about all of which Mr. Royce lacks personal

16  knowledge."  (*See id.*)  RED also moves to strike Exhibits 1 and 3 to Mr. Royce's

17  declaration under Federal Rules of Evidence 403, 106, 801, 802, and 901.  (*See* Reply at

18  3-4.)

19          "A witness may testify to a matter only if evidence is introduced sufficient to

20  support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid.

21  602.  "Evidence to prove personal knowledge may consist of the witness's own

22  testimony."  *Id.*  The majority of Mr. Royce's declaration consists of statements made

1    with personal knowledge.  For example, Mr. Royce testifies to his knowledge of the fact

2    of the internet postings that underlie Plaintiffs' claims and portions of RED's website

3    (*see, e.g.*, Royce Decl. ¶¶ 23-24) and submits photographic evidence of the internal

4    components and storage capacity of the Mini-Mag (*see id.* ¶¶ 32, 35, Exs. 3-4).  Because

5    the statements in Mr. Royce's declaration are largely made with personal knowledge, the

6    court DENIES Defendants' motion to strike Mr. Royce's declaration.  However, should

7    any specific statement in Mr. Royce's declaration be unsupported by personal

8    knowledge, the court will disregard such statements in the discussion to follow.

9    **C.    Defendants' Summary Judgment Motion**

10          Defendants move for summary judgment on all of Plaintiffs' remaining claims.

11   The court GRANTS in part and DENIES in part the motion as set forth below.

12          1.    Attribution of Mr. Land's Statements to RED

13          Defendants argue, in the span of three paragraphs, Mr. Land's statements on

14   Reduser.net or Facebook are not attributable to RED and therefore cannot be the basis of

15   claims against RED.  (*See* MSJ at 11.)  Defendants cite only one case for the proposition

16   that RED does not have a duty to monitor and remove offensive posts from Reduser.net.

17   (*See id.* (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)).)  That is beside

18   the point, however, because Mr. Land's posts on Reduser.net are made in his capacity as

19   the president, shareholder, and most senior employee of RED.  Mr. Land's posts give

20   updates on RED's litigation against Jinni Tech, discuss RED product manufacturing,

21   sourcing, and testing, discusses RED's costs, and refers to RED as "our" and "we."  (*See,*

22   *e.g.*, Royce Decl. ¶ 3, Ex. 2; Forum Posts at JT001357-58.)  Defendants cite no authority

1  to support the contention that RED's president and sole shareholder was not acting on

2  behalf of RED when he made these statements.  Accordingly, the court does not consider

3  Defendants' argument on this point any further.

4      2.  Lanham Act Claims

5      Jinni Tech's unfair competition and false advertising claims are both based on the

6  Lanham Act, 15 U.S.C. § 1125(a).[3]  (*See* FAC ¶¶ 107-15.)  15 U.S.C. § 1125 "allows one

7  competitor to sue another if it alleges unfair competition arising from false or misleading

8  product descriptions."  *See Pom Wonderful LLC v. The Coca-Cola Co.*, 573 U.S. 102,

9  106 (2014).  The cause of action the Act creates imposes civil liability on any person who

10  "uses in commerce any word, term, name, symbol, or device, or any combination thereof,

11  or any false designation of origin, false or misleading description of fact, or false or

12  misleading representation of fact, which . . . misrepresents the nature, characteristics,

13  qualities, or geographic origin of his or her or another person's goods, services, or

14  commercial activities."  15 U. S. C. §1125(a)(1).  The elements of this claim are (1) a

15  false statement of fact by the defendant in a commercial advertisement about its own or

16  another's product; (2) the statement actually deceived or has the tendency to deceive a

17  substantial segment of its audience; (3) the deception is material, in that it is likely to

18  //

---

19    [3] 15 U.S.C. § 1125(a) codifies Section 43(a) of the Lanham Act.  *Southland Sod Farms v.*

20  *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  Plaintiffs categorize their unfair competition and false advertising claims as two distinct claims.  (*See* FAC ¶¶ 107-15.)  However,

21  both claims fall under the same legal standard and the court analyzes them together.  *See* 5 McCarthy on Trademarks and Unfair Competition § 27:53 (5th ed.) (noting that courts apply the

22  same test to determine whether the claim is based on the defendant's goods and services or the plaintiff's goods and services).

1    influence the purchasing decision; (4) the defendant caused its false statement to enter

2    interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of

3    the false statement, either by direct diversion of sales from itself to defendant or by a

4    lessening of the goodwill associated with its products." *Skydive Ariz., Inc. v.*

5    *Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012); *see also Southland Sod Farms v.*

6    *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citing *Cook, Perkiss and Liehe,*

7    *Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)).

8        "Statements of opinion," as opposed to statements of fact, "are not generally

9    actionable under the Lanham Act." *Coastal Abstract Serv., Inc. v. First Am. Title Ins.*

10   *Co.*, 173 F.3d 725, 731 (9th Cir. 1999).  "Whether an allegedly defamatory statement is

11   one of opinion or fact is a question of law." *Gardner v. Martino*, 563 F.3d 981, 986 (9th

12   Cir. 2009).  Courts in this circuit apply a three part test to make this determination, and

13   analyze: "(1) whether the general tenor of the entire work negates the impression that the

14   defendant was asserting an objective fact, (2) whether the defendant used figurative or

15   hyperbolic language that negates the impression, and (3) whether the statement in

16   question is susceptible of being proved true or false." *Id.* at 987.

17       "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may

18   show that the statement was literally false, either on its face or by necessary implication,

19   or that the statement was literally true but likely to mislead or confuse consumers." *See*

20   *id.*  "Only an unambiguous message can be literally false." *See Nutrition Distribution*

21   *LLC v. PEP Research, LLC*, No. 16CV2328-WQH-BLM, 2019 WL 652391, at *4 (S.D.

22   Cal. Feb. 15, 2019) (quoting *Novartis Consumer Health v. Johnson & Johnson*, 290 F.3d

578, 588 (3d Cir. 2002)).  If a statement is literally false, courts presume there is

deception and the plaintiff need not prove how buyers perceive it.  *See Time Warner*

*Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007).  If a statement is true,

the plaintiff must provide additional evidence that the statement "is nevertheless likely to

mislead or confuse consumers."  *Id.*  Reactions of the public to determine whether a

literally true statement misleads customers are typically tested through the use of

consumer surveys.  *Southland Sod Farms*, 108 F.3d at 1139.  To survive summary

judgment, a plaintiff must provide admissible evidence of literal falsity or customer

confusion beyond self-serving conclusory statements.  *See Schering–Plough Healthcare*

*Prods. v. Schwarz Pharma*, 586 F.3d 500, 513 (7th Cir. 2009) ("[The plaintiff] cannot

just intone 'literal falsity' and by doing so prove a violation of the Lanham Act.").

Defendants argue they are entitled to summary judgment on Jinni Tech's Lanham

Act claims because the statements at issue were either literally true, substantially true, or

not actionable assertions of fact.  (*See* MSJ at 10.)

      *a.   "We developed our own IP and Firmware"*

Mr. Land made this statement in a forum post on Reduser.net on July 31, 2016.[4]

(*See* FAC ¶ 50; Forum Posts at JT001358.)  RED asserts that statements that RED

develops customized hardware and software for its RED SSD media accessories are

//

---

[4] Plaintiffs' first amended complaint also alleges that in a subsequent post dated August 4, 2020, Mr. Land states that "we make custom firmware specific to the cards and we have a pretty extensive QC and our development on media is pretty insane and go[es] through many, many, many years of testing with a lot of engineers to pass all our media . . ."  (FAC ¶ 51.) However, this August 4, 2020, post does not appear in the record.  (*See generally* Dkt.)

1   literally true.  (*See* MSJ at 13 (citing RED Dep. at 58:2-16, 97:14-99:23) ("Q: Wait, now.

2   Are you saying that you tell Micron to put custom firmware on these cards before they

3   supply them to you?  A: Yes.")).)  RED further asserts that the fact that Mr. Royce could

4   not source all of the hardware and firmware for the Jinni Mag off-the-shelf "proves that

5   RED's Mini-Mag uses customized hardware and firmware."  (*See* MSJ at 13.)  For

6   example, although Mr. Royce used some off-the-shelf components to create the Jinni

7   Mag, he also testified that he "made [his] own pass-through adaptor . . . And I 3D-printed

8   a casing for them."  (*See id.* (quoting Rankin Decl. ¶ 5, Ex. 4 ("Royce Dep.") at

9   72:23-73:1).)  Mr. Royce also had to "copy" some "random characters" in the

10   Mini-Mag's software code because "without them the camera cripples itself."  (*See*

11   Royce Dep. at 76:20-78:7.)

12          In response, Plaintiffs assert that the "primary component" of the Mini-Mag is the

13   SSD, that Mini-Mag uses generic SSDs RED purchases, that tests and verifications on

14   RED-branded SSDs are done by the original SSD manufacturer, and that RED "added

15   nothing of material value to this commonly used SSD storage device."  (*See* Resp. at 6.)

16   Further, Jinni Tech asserts that RED "cannot even define the imaginary 'custom'

17   firmware and was not able to indicate what this firmware is, where in the SSD this

18   firmware resides or how this 'customized' firmware processes the information differently

19   from other generic SSDs."  (*See id.*)

20          Plaintiffs also rely on a Reduser.net forum post by Mr. Land, which states that

21   RED is not trying to pretend that the SSDs are "magic fairy tales," but states that their

22   higher cost "is because the R&D expense of the development of custom firmware (and

yes I mean camera firmware to write to the cards), the testing, and the support all that

gets amortized into them.  And yes, Micron gives us cards with special code on them.

From Micron.  You need to copy that code from our Mini Mags onto whatever else to

spoof it."  (*See id.*)

Statements that RED "developed [its] own IP and firmware" are ambiguous—and,

as such, cannot be literally false—given the evidence before the court.  *See Nutrition*

*Distribution LLC*, 2019 WL 652391, at *4.  Although Plaintiffs provide evidence that

RED's SSDs are standard-issue, Mr. Royce's testimony about the steps he had to take to

create the JinniMag, including "copying" some "random characters," suggests that RED's

Mini-Mag product as a whole may include hardware and/or software created specifically

by RED.  Moreover, neither party submits expert testimony that might clarify the issue.

*See* 5 McCarthy on Trademarks and Unfair Competition § 27:56 (5th ed.) ("If the

advertising involves medical, scientific, or technical matters, expert witnesses will be

necessary to unravel truth from falsity.")

Because these statements are ambiguous, Plaintiffs are required to prove either

that Defendants intended to mislead customers or that the statements "actually deceived

or ha[ve] the tendency to deceive a substantial segment of [their] audience."  *Southland*

*Sod Farms*, 108 F.3d at 1139.  Plaintiffs submit no evidence of intent or of a customer

confusion survey.  (*See generally* Resp.; Dkt.)  Moreover, there is no evidence in the

record from any consumer that relied on this statement in making its purchasing decision.

(*See generally* Dkt.)

//

ORDER - 14

1    Therefore, Plaintiffs fail to submit evidence that creates a genuine dispute of

2    material fact regarding the falsity of the statements that RED developed its own IP and

3    firmware.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs'

4    Lanham Act claims as they relate to Mr. Land's statements that RED developed its own

5    IP and firmware.[5]

6        b.  RED "*spent millions of dollars testing, certifying and QC every media card
         that we ship.  It's why we have significantly less card errors than other
7         companies using generic media . . . even reputable generic media.*"

8    Mr. Land made this statement in a Reduser.net forum post on July 31, 2016.  (*See*

9    FAC ¶ 50; Forum Posts at JT001358.)  This statement is not ambiguous and can be tested

10   by direct comparison to evidence regarding the amount of money RED spent and data on

11   card errors.  RED contends the statement is "literally true."  (*See* MSJ at 14 (citing 2d

12   Land Decl. ("Research and Development and Quality Control costs easily exceed a

13   million dollars.").)  Neither party submits documentary evidence of RED's expenditures

14   or the Mini-Mag's card error rates.  (*See generally* MSJ; Resp.)  Nevertheless, Plaintiffs

15   contend that RED could not have spent millions of dollars testing and certifying its media

16   cards because "[t]he SSD inside the R[ED-]branded memory storage device is nothing

17   //

---

18   [5] Defendants also move for summary judgment on an apparent allegation from Plaintiffs
19   that "RED owns patents in the technology used in its RED SSD media that is infringed by other
     companies who make RED-compatible SSD media."  (*See* MSJ at 14.)  Plaintiffs oppose
     Defendants' motion based on the same apparent allegation.  (*See* Resp. at 4 ("R[ED]'s allegation
20   that Jinni [Tech] stole R[ED]'s IP and infringed Red's patent is false.").)  However, neither party
     presents evidence of the specific statement or statements to which they refer.  (*See generally*
21   MSJ.; Resp.)  Mr. Land's Reduser.net posts reference RED's "IP," but do not specifically
     mention RED's patents.  (*See* Forum Posts at JT001360-63.)  The court cannot adjudicate an
22   argument in favor of summary judgment based on the veracity of a statement without evidence
     of that statement.

ORDER - 15

1    more than an off-the-shelf generic SSD with standard manufacturer firmware." (Royce

2    Decl. ¶ 6.)  In response to that argument, Defendants contend that "[t]he mSATA SSD is

3    one component that goes into the RED Mini-Mag, along with several other commercially

4    available and custom-made components." (*See* Reply at 6 (citing 2d Land Decl. ¶ 2).)

5    Further, Mr. Land testifies that RED's research and development and quality control

6    costs "easily exceed a million dollars." (*See* 2d Land Decl. ¶ 5.)

7        RED's expenditures should have been provable through document discovery.

8    Nevertheless, Mr. Royce's and Mr. Land's testimony combine to create a genuine dispute

9    of material fact regarding whether RED did (or even could have) spent "spent millions of

10   dollars testing, certifying and QC every media card." Accordingly, Defendants are not

11   entitled to summary judgment on Plaintiffs' Lanham Act claims as they pertain to RED's

12   expenditures on testing and certifying its media cards.

13        *c.   Allegedly False Marketing of RED SSD media as made in the United States*

14       Plaintiffs submit an image of a RED Mini-Mag that states "MADE IN USA," and

15   an SSD card (presumably retrieved from inside the Mini Mag) that states "Product of

16   SINGAPORE." (*See* Royce Decl. ¶ 4, Ex. 3.)  Plaintiffs contend, based on this image,

17   that Defendants misrepresent the geographic origin of their products. (*See* MSJ Resp. at

18   14.)  A plaintiff bringing a Lanham Act unfair competition claim based on a "Made in the

19   USA" designation must show the designation is literally false or misleading to the public.

20   *See Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 987 (D. Minn.

21   2014).

22   //

In support of its summary judgment motion, RED does not appear to dispute the veracity of the image but presents declaration testimony from Mr. Land that "[a]lthough the Mini-Mag does contain some foreign components, RED products are primarily manufactured in California." (*See* MSJ at 15 (citing Land Decl. ¶¶ 5, 8).)  Therefore, the court concludes that truth or falsity of the "Made in USA" label is ambiguous in that it is unclear as to whether the statement refers to the entire Mini-Mag product or simply the component on which it is printed.  Plaintiffs bear the burden to submit evidence that the ambiguous label "actually deceived or has the tendency to deceive a substantial segment of its audience." *Southland Sod Farms*, 108 F.3d at 1139.  As Plaintiffs provide no such evidence, Plaintiffs have failed to create a genuine dispute of material fact, and Defendants are entitled to summary judgment on Plaintiffs' Lanham Act claim as it relates to the Mini-Mag's "MADE IN USA" label.

>    d.  *Allegedly false marketing of RED's 480GB SSD media as 512GB SSD media.*

RED admits that it markets its 512 gigabyte SSD media as having a capacity of 512 gigabytes of storage space.  (*See* MSJ at 15.)  Defendants contend that the dichotomy between actual storage capacity and useable storage capacity is "widely known throughout the industry and RED's marketing is consistent with industry standards and consumer expectations for digital storage media." *See id.*  Defendants, however, cite to no evidence in support of industry standards or consumer expectations.  At most, Defendants submit the result of a Google search for "512gb ssd [*sic*] actual capacity" that

//

1    returns primarily results that explain that a 512 gigabyte SSD "will contain between 476

2    and 490 [gigabytes] of useable storage space."  (*See id.* (citing Rankin Decl. ¶ 10, Ex. 9).)

3        Plaintiffs respond that RED's "512GB" SSD cards are misleading beyond the

4    actual storage-useable storage distinction, because the cards in fact only contain 447

5    gigabytes of useable storage capacity, and they were in fact simply relabeled 480

6    gigabyte SSD cards obtained from Micron.  (*See* Resp. at 15 (citing Royce Decl. ¶ 35,

7    Ex. 4 (screenshot showing the "Size" and "Size Available" as "447.1 GB")).)

8        In contrast to the other statements at issue in Plaintiffs' Lanham Act claims,

9    neither party submits evidence showing the specific statements RED makes when it

10   markets its SSD cards as having a capacity of 512 gigabytes of storage space.  (*See*

11   *generally* MSJ.; Resp.; Reply.)  Without that evidence, the court is unable to determine

12   whether any specific statement is ambiguous or not, and therefore whether Plaintiffs are

13   required to submit evidence of customer confusion.  Given this lack of evidence,

14   Defendants have not met their burden to produce evidence negating an element of

15   Plaintiffs' claim and are not entitled to summary judgment on Plaintiffs' claim as it

16   pertains to RED's marketing of the storage capacity of its SSD cards.

17        e.  *Statements identifying Jinni Tech and the JinniMag as a "scam" and Jinni
             Tech as a "criminal," "hacker" and "pirate."*

18        The statements made referring to the JinniMag as a "scam" and asserting that Jinni

19   Tech was engaging in "criminal behavior" were not made by Mr. Land, but rather by

20   other Reduser.net users. *See* Forum Posts at JT001350-53.  No evidence in the record

21   suggests these users are employed by or affiliated with RED, other than the fact that they

ORDER - 18

1    use RED products.  *See id.*  As these statements cannot be attributed to Defendants,

2    Defendants are entitled to summary judgment on Plaintiffs' Lanham Act claims as they

3    pertain to statements that the JinniMag is a "scam" or that Jinni Tech is a "criminal,"

4    "hacker," or "pirate."

5            3.  Defamation and Product Disparagement / Trade Libel

6            Jinni Tech's trade libel claim and Mr. Royce's defamation claim against

7    Defendants are based on substantially the same allegations that form the basis of

8    Plaintiffs' Lanham Act claims against defendants; namely, Mr. Land's allegedly false or

9    misleading statements in internet forums about Jinni Tech and Mr. Royce.  (*See* FAC

10   ¶¶ 166-73.)

11           Under Washington law, to avoid summary judgment on a defamation claim, a

12   plaintiff must make a prima facie showing of facts that would raise a genuine issue of

13   material fact as to each of the following elements: (1) falsity, (2) an unprivileged

14   communication, (3) fault, and (4) that the communication proximately caused

15   damages.  *Mark v. Seattle Times*, 635 P.2d 1081, 1089 (Wash. 1981); *see also Mohr v.*

16   *Grant*, 108 P.3d 768, 776 (Wash. 2005).  A plaintiff must establish each element "by

17   evidence of convincing clarity."  *Mark*, 635 P.2d at 1089.

18           To establish the first element of defamation, "the plaintiff must show the statement

19   is provably false, either in a false statement or because it leaves a false

20   impression."  *Mohr*, 108 P.3d at 775.  Washington courts do "not require a defamation

21   defendant to prove the literal truth of every claimed defamatory statement."  *Id.* at

22   775.  Rather, "[a] defendant need only show that the statement is substantially true or that

1   the gist of the story, the portion that carries the 'sting,' is true." *Id.* (quoting *Mark*, 635

2   P.2d at 1092).  "The 'sting' of a report is defined as the gist or substance of a report when

3   considered as a whole." *Id.* (quoting *Herron v. King Broadcasting*, 776 P.2d 98, 102

4   (Wash. 1989).  "Where a report contains a mixture of true and false statements, a false

5   statement (or statements) affects the 'sting' of a report only when 'significantly greater

6   opprobrium' results from the report containing the falsehood than would result from the

7   report without the falsehood." *Herron*, 776 P.2d at 102.

8          The tort of trade libel is "substantively similar to defamation." *Auvil v. CBS 60*

9   *Minutes*, 67 F.3d 816, 820 (9th Cir. 1995).  "To establish a claim of product

10  disparagement, also known as trade libel, a plaintiff must allege that the defendant

11  published a knowingly false statement harmful to the interests of another and intended

12  such publication to harm the plaintiff's pecuniary interests." *Id.* (citing Restatement

13  (Second) of Torts § 623A (Am. Law Inst. 1977)).

14         The court has already determined that Defendants are not entitled to summary

15  judgment on Plaintiffs' Lanham Act claims with respect to Mr. Land's statements

16  regarding RED's expenditures on testing and the storage capacity of RED's SSD media

17  cards.  (*See supra* § III.C.2.)  However, those statements do not reference Mr. Royce or

18  Jinni Tech, and are therefore not actionable as a defamation or trade libel claim.

19  Moreover, the allegedly defamatory statements made referring to the JinniMag as a

20  "scam" and asserting that Jinni Tech was engaging in "criminal behavior" were not made

21  by Mr. Land, but rather by other Reduser.net users for whom no evidence suggests they

22  are employed by or affiliated with RED, other than the fact that they use RED products.

ORDER - 20

*See* Forum Posts at JT001350-53.  Therefore, Jinni Tech has not pointed the court to any of Defendants' statements about Jinni Tech for which there is a genuine dispute of material fact that can sustain a defamation or trade libel claim.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' defamation and trade libel claims.

### 4.  Tortious Interference

Plaintiffs allege that Defendants are liable for tortious interference based on the same statements Defendants made about Plaintiffs discussed above.  (*See* FAC ¶ 138.)  In their complaint, Plaintiffs allege that "[c]ustomers who preordered the JinniMag canceled their orders after reading RED's and Mr. Land's messages on Facebook and [R]eduser.net.  Other interested customers were deterred from placing orders."  (*See id.* ¶ 140.)

"To prove tortious interference, the plaintiff must produce evidence sufficient to support all the following findings: (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of and intentional interference with that relationship or expectancy; (3) a breach or termination of that relationship or expectancy induced or caused by the interference; (4) an improper purpose or the use of improper means by the defendant that caused the interference; and (5) resultant damage."  *Tamosaitis v. Bechtel Nat'l, Inc.*, 327 P.3d 1309, 1313 (Wash. Ct. App. 2014) (quoting *Eugster v. City of Spokane*, 91 P.3d 117, 123 (Wash. Ct. App. 2004)).  Although differences exist, the legal standards for tortious interference with contract and tortious interference with a business expectancy or relationship largely overlap.  *Compare* Wash.

1   Pattern Jury Instr. Civ. WPI 352.01 (7th ed. July 2019) *with* Wash. Pattern Jury Instr.

2   Civ. WPI 352.02 (7th ed. July 2019).

3   　　　　Exercising one's legal interest in good faith is not improper interference. *Elcon*

4   *Const., Inc. v. E. Washington Univ.*, 273 P.3d 965, 971 (Wash. 2012). However, unlike

5   defamation, a plaintiff need not prove falsity to prevail on a tortious interference claim.

6   Defendants do not discuss Plaintiffs' tortious interference claim aside from asserting that

7   Defendants are entitled to summary judgment on that claim for the same reason that they

8   are entitled to summary judgment on Plaintiffs' Lanham Act and defamation claims—

9   namely, that Mr. Land's alleged statements about Jinni Tech are not false. (*See generally*

10   MSJ.)

11   　　　　However, because falsity is not a required element of tortious interference,

12   Defendants have not carried their burden to 1) produce evidence negating an essential

13   element of the nonmoving party's case, or 2) show that the nonmoving party lacks

14   evidence of an essential element of its claim or defense, *see Nissan Fire & Marine Ins.*

15   *Co.*, 210 F.3d at 1106, and are not entitled to summary judgment on Plaintiffs' tortious

16   interference claim.

17   　　　　5.  <u>False Light</u>

18   　　　　"False light differs from defamation in that it focuses on compensation for mental

19   suffering, rather than reputation." *Corey v. Pierce Cty.*, 225 P.3d 367, 373 (Wash. Ct.

20   App. 2010). "[L]ike defamation, false light claims require a showing of falsity and

21   knowledge of, or reckless disregard for that falsity." *Id.* As discussed above, Plaintiffs

22   do not submit evidence capable of creating a genuine dispute of material fact that

1    Defendants made false statements about Plaintiffs.  *See supra* § III.C.2.  Moreover,

2    Plaintiffs submit no evidence of Mr. Royce's mental suffering.  *See infra* § III.C.6.

3    Therefore, Defendants are entitled to summary judgment on Plaintiffs' claim for false

4    light.

5            6.  <u>IIED and NIED</u>

6            Plaintiffs' claims for IIED and NIED are brought on behalf of Mr. Royce

7    individually.  (*See* FAC ¶¶ 158-64.)

8            *a.  IIED*

9            The burden of proof on an IIED claim is stringent.  *See Lyons v. U.S. Bank Nat.*

10   *Ass'n*, 336 P.3d 1142, 1151 (Wash. 2014).  To prevail on an IIED claim, "a plaintiff must

11   prove (1) outrageous and extreme conduct by the defendant, (2) the defendant's

12   intentional or reckless disregard of the probability of causing emotional distress, and (3)

13   actual result to the plaintiff of severe emotional distress."  *Steinbock v. Ferry Cty. Pub.*

14   *Util. Dist. No. 1*, 269 P.3d 275, 282 (Wash. Ct. App. 2011).

15           "The first element requires proof that the conduct was 'so outrageous in character,

16   and so extreme in degree, as to go beyond all possible bounds of decency, and to be

17   regarded as atrocious, and utterly intolerable in a civilized community.'"  *Lyons*, 336

18   P.3d at 1151 (quoting *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002); *Dicomes*

19   *v. State*, 782 P.2d 1002, 1012 (Wash. 1989)).  "The question of whether certain conduct

20   is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to

21   determine if reasonable minds could differ on whether the conduct was sufficiently

22   extreme to result in liability."  *Id.* (quoting *Dicomes*, 782 P.2d at 1013.)  Similarly, "[i]t is

1   for the court to determine whether on the evidence severe emotional distress can be

2   found; it is for the jury to determine whether, on the evidence, it has in fact

3   existed." *Id.* (quoting Restatement (Second) of Torts § 46 (Am. Law Inst. 1965)).

4          Plaintiffs point to no "outrageous and extreme conduct" that goes beyond mere

5   insults and reaches the level of "utterly intolerable in a civilized community." (*See*

6   *generally* Resp.); *Lyons*, 336 P.3d at 1151 (quoting *Robel*, 59 P.3d at 619).  Moreover,

7   Plaintiffs submit no evidence of emotional distress.  (*See generally id.*; Royce Decl.)

8   Therefore, Defendants are entitled to summary judgment on Plaintiffs' IIED claim.

9          *b.  NIED*

10          Negligent infliction of emotional distress is a narrowly construed tort under which

11   a plaintiff must prove (1) that he or she suffered emotional distress that is within the

12   scope of foreseeable harm of the negligent conduct, (2) the plaintiff reasonably reacted

13   given the circumstances, and (3) objective symptomatology confirms the distress." *Repin*

14   *v. State*, 392 P.3d 1174, 1184 (Wash. Ct. App. 2017) (citing *Bylsma*, 293 P.3d at

15   1170-71)).  "[T]o satisfy the objective symptomology requirement . . . a plaintiff's

16   emotional distress must be susceptible to medical diagnosis and proved through medical

17   evidence." *Hegel v. McMahon*, 960 P.2d 424, 431 (Wash. 1998).  The plaintiff must

18   provide "objective evidence regarding the severity of the distress, and the causal link

19   between the observation at the scene and the subsequent emotional reaction." *Id.*

20          Mr. Royce fails provides no objective medical evidence regarding the severity of

21   his distress or a causal link between his distress and Defendants' actions.  Accordingly,

22   Defendants are entitled to summary judgment on Mr. Royce's NIED claim.

1         7.  <u>Unfair Competition under the CPA</u>

2         Plaintiffs' claim under the CPA is based on the same alleged facts that underlie

3    Plaintiffs' Lanham Act unfair competition claims.  (*See* FAC ¶ 144 (asserting that "the

4    acts described above" violate the CPA).)  The elements of a CPA action are "(1) unfair or

5    deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact;

6    (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Bain v.*

7    *Metro. Mortg. Grp., Inc.*, 285 P.3d 34 (Wash. 2012).  Courts considering CPA claims

8    must take guidance from "final decisions of the federal courts . . . interpreting the various

9    federal statutes dealing with the same or similar matters."  RCW 19.86.920.  The CPA

10   "shall be liberally construed that its beneficial purposes may be served."  RCW

11   19.86.920.  *Id.*

12        "[T]here is no question that false advertising within the scope of the Lanham Act

13   (except perhaps for its interstate commerce requirement) is an unfair or deceptive practice

14   within the scope of the CPA." *CertainTeed Corp. v. Seattle Roof Brokers*, No. C 09-563

15   RAJ, 2010 WL 2640083, at *6 (W.D. Wash. June 28, 2010).  Accordingly, Defendants

16   are not entitled to summary judgment on Plaintiffs' CPA claims as they pertain to RED's

17   expenditures on testing and certifying its media cards or statements about the storage

18   capacity of RED's products.  However, for the reasons stated above, Defendants are

19   entitled to summary judgment on the remainder of Plaintiffs' CPA claim.  *See supra*

20   § III.C.2 (discussing Defendants' entitlement to summary judgment on the same grounds

21   on Plaintiffs' analogous Lanham Act claim).

22   //

8.  <u>Privacy Violations under RCW 9.73.060</u>

Defendants move for summary judgment on Plaintiffs' claim under RCW 9.73.060.  RCW 9.73.060 provides a private right of action for violations of the provisions of RCW Chapter 9.73.  *See* RCW 9.73.060.  Defendants contend that Plaintiffs' sole privacy claim is based on posts by Reduser.net users that revealed Mr. Royce's personal address and phone number, and that such a claim is not actionable under RCW 9.73.060.  (*See* MSJ at 26; *see also* FAC ¶¶ 151-152.)  Plaintiffs did not respond to Defendants' arguments on this claim, and Plaintiffs' response does not even mention the words "privacy," "address," or any variation of "telephone number."  (*See generally* Resp.)

By its plain language, RCW 9.73.060 does not provide a cause of action for alleged privacy violations beyond those expressly set forth in RCW Chapter 9.73.  *See* RCW 9.73.060.  Those provisions address the interception of communications.  *See, e.g.*, RCW 9.73.030 (addressing "[i]ntercepting, recording, or divulging private communication"); RCW 9.73.040 (providing an exception by court order under certain circumstances); *see also State v. Gunwall*, 720 P.2d 808, 817 (Wash. 1986) ("We further note that pursuant to RCW 9.73.060, a party may sue for damages because of an unlawful intercept.").

Putting aside that the alleged postings were not made by Defendants, the court finds no evidence in the record that creates a genuine dispute of fact that any posts were the result of an intercepted, recorded, or divulged communication.  (*See generally* Dkt.) //

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' privacy claim under RCW 9.73.060.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendants' motion for summary judgment (Dkt. # 79) as follows:

- The court DENIES Defendants' summary judgment motion with respect to Plaintiffs' Lanham Act and Washington Consumer Protection Act claims based on statements related to RED's expenditures on testing and certifying its media cards and the storage capacity of RED's SSD media cards;

- The court DENIES Defendants' summary judgment motion with respect to Plaintiffs' claim for tortious interference; and

- The court GRANTS Defendants' summary judgment motion in all other respects.

Dated this 20th day of April, 2020.

JAMES L. ROBART
United States District Judge