1

2

3

4

5

6

7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8
AT SEATTLE

9

10
JINNI TECH LTD., et al.,                        CASE NO. C17-0217JLR

11
                          Plaintiffs,           ORDER GRANTING
                                                DEFENDANTS' SECOND
            v.                                  MOTION FOR SUMMARY
12
                                                JUDGMENT
RED.COM, INC., et al.,
13
                          Defendants.
14

15
## I.   INTRODUCTION

16
        Before the court is Red.com, Inc. and Red.com, LLC's (collectively, "Defendants"

17
or "RED") second motion for summary judgment.  (Mot. (Dkt. # 94).)  Plaintiffs Jinni

18
Tech, Ltd. ("Jinni Tech") and Bruce Royce (collectively, "Plaintiffs") oppose the motion.

19
(Resp. (Dkt. # 99).)  The court has considered the motion, the parties' submissions in

20
support of and in opposition to the motion, the relevant portions of the record, and the

21
//

22
//

1   applicable law.  Being fully advised,[1] the court GRANTS Defendants' second motion for

2   summary judgment.

3                              II.    BACKGROUND

4   **A.    Factual Background**

5          1.   The Mini-Mag and JinniMag

6          RED manufactures high-end digital cameras used to create motion pictures.  (*See*

7   2nd Land Decl. (Dkt. # 80) ¶ 2.)  RED claims to produce an "ecosystem comprised of

8   everything from the image capture at the sensors through the camera and its processes to

9   generate and output compressed RAW image files to storage media."  (*See id.*)  As part of

10  this "ecosystem," RED produces solid-state drives ("SSDs") that RED markets as

11  "Mini-Mags."  (*Id.*)  The Mini-Mags store the camera's digitally compressed RAW

12  recordings until they can be downloaded onto computers for movie post-production.  (*See*

13  *id.*; 1st Rankin Decl. (Dkt. # 81) ¶ 2, Ex. 1 ("RED Dep.") at 103:8-104:1.)  RED claims

14  that its cameras are designed such that without RED firmware in a connected SSD (such

15  as a Mini-Mag), the RED camera's operating software system cannot properly

16  communicate with a memory card and thus the system will not function.  (*See* RED Dep.

17  at 42:16-44:8; 2nd Land Decl. ¶ 3.)  In 2016, Mr. Royce's company, Jinni Tech, launched

18  for sale an SSD designed for use with RED's cameras that it called the "JinniMag."  (*See*

19  1st MSJ at 6; 1st Royce Decl. (Dkt. # 86) ¶ 2.)  Jinni Tech identified the JinniMags on the

20  "RED Scarlet-W Facebook group" as "Affordable, Fully Compatible R[ED] Mags."  (*See*

21

22          [1] Neither party requests oral argument (see MSJ at 1; Resp. at 1), and the court finds oral
    argument unhelpful to its disposition of the motion, see Local Rules LCR 7(b)(4).

1st MSJ at 6; FAC ¶ 67.)  Jinni Tech claims that the JinniMag was an attempt to "break

R[ED]'s monopoly on memory storage devices for RED cameras."  (*See* Resp. to 1st

MSJ (Dkt. # 85) at 2.)  According to Jinni Tech, RED-branded storage devices "have the

same standard features of a generic SSD memory device."  (1st Royce Decl. ¶ 3.)  By

designing its system to work only with RED-branded SSDs, Jinni Tech asserts that RED

forces its users to buy RED's storage devices containing generic SSD cards at premium

prices, "allowing R[ED] to price gauge their customers in the process."  (*See id.*)

   2.  Online Statements

   Soon after Jinni Tech announced the JinniMag, it became a topic of conversation

in the online forums on Reduser.net, a "social media platform" on which RED users

discuss RED equipment.  (*See* 1st Land Decl. (Dkt. # 17) ¶ 4.)  Landmine Media, Inc.

("Landmine"), a Colorado corporation of which Jarred Land is a part owner, operates

Reduser.net.  (*See id.*)  A Reduser.net user created a thread titled "Cheap third party

R[ED] MiniMag replacement – JinniMag?" in which several users made the following

comments, among others:

> To offer licensing out to 3rd parties seemed unlikely, and yet, these new
> JinniMags ads have the R[ED] logo right on them . . . Has R[ED] endorsed
> this, or is this a lawsuit in the making? . . . EDIT: Thanks Phil for the info.
> Apparently this is a scam.
>
> Doesn't RED use a proprietary interface?
>
> Buying any electronic non-authorized 3rd party product for a RED camera is
> a VERY bad idea . . . Do NOT waste your money – you will be sorry.

//

//

1      What I read there doesn't sound like the best way to introduce yourself as the
       producer of a product that probably violates patents, copyrights and what not.
2      Copying things is not making things, everyone knows and see's [sic] that.

3      (1st Rankin Decl. ¶ 7, Ex. 6 ("Forum Posts") at JT001350-53.)  On July 31, 2016, Mr.

4      Land made the following post:

5          Guys . . . I can't tell you how much this pisses me off.  Not from a business
           perspective, but as a patent holder and creator.  Like all of you, we spend a
6          lot of time money and effort creating what we do.  For our media, we
           developed our own IP and Firmware and spent millions of dollars testing,
7          certifying and [running quality control ("QC") on] every media card that we
           ship.  Its [sic] why we have significantly less card errors than other
8          companies using generic media . . . even reputable generic media.  Media is
           one of the most critical components of the entire system and the way we write
9          to a card is very different than a normal SSD is programmed for.  For some
           random company to hack and duplicate our IP and our firmware (which is
10         the only way they could do this) is exactly like someone stealing your films
           and calling them their own and selling them to others.  It goes against
11         everything I stand for.  I don't know where this company is from.  I assume
           the UK cover is just bullshit.  Someone said China but I really hope this is
12         not the case as China has made such significant improvements over the last
           decade turning around their attitude towards Copyright infringement,
13         Trademark violations, and IP theft (which it appears this company has broken
           all three in one swoop)[.]  I am shocked some of you are here are [sic] actually
14         endorsing this.   I will shut RED completely down . . . I am not
           kidding . . . [i]f stealing each other[']s shit suddenly is deemed acceptable.
15         It's not a world I want to work or create or live in.

16     (Forum Posts at JT001357-58.)  Several posts supportive of Mr. Land followed, including

17     the following:

18         These cheap knock off SSDs are clearly engaging in criminal behavior.  Not
           OK.
19
           Disappointing and not cool.
20
           Saw this on [Facebook] and thought maybe it was a third-party licensing
21         deal.  Definitely won't be looking into it anymore since, according to Jarred,
           they just ripped the RED Mag off completely.  Idiots.
22

ORDER - 4

(Forum Posts at JT001360-63.)  Mr. Land then made a second post on August 1, 2016, that included in part the following:  "Lawyers will deal with these guys doing this. . . . But it is you guys that think that this is OK that have me way way way more pissed off[.]"  (Forum Posts at JT001364-65.)

A similar thread on Facebook also started on July 31, 2016, started by Facebook user Behrooz Modirrousta.  (1st Rankin Decl. ¶ 8, Ex. 7 ("Facebook Posts").)  Mr. Land also posted on this Facebook thread as follows:

> This is not legit . . . not certified . . . not endorsed and will never be because its [sic] bullshit.  Even if this was real there are too many inaccuracies and violations going on here to list but I figure you all are smart enough to see through this.

(Facebook Posts at JT001453.)  Mr. Land's above statements on Reduser.net and on Facebook form the basis of several of Jinni Tech's claims in this lawsuit.  According to Jinni Tech, Mr. Land "never took any steps to discourage RED users from making these vicious, personal attacks against Mr. Royce," Jinni Tech's owner.  (See FAC ¶ 95.)  Jinni Tech alleges that these statements "caused serious damage to Mr. Royce's professional reputation" and caused Mr. Royce and his family "serious emotional distress, anxiety, and stress, resulting in harm to Mr. Royce's emotional and physical health, including severe physical pain and a sleep disorder."  (Id. ¶¶ 97-98.)

**B.      Procedural Background**

Plaintiffs' operative complaint asserts 11 claims:  (1) false advertising under 15 U.S.C. § 1125(a) (Lanham Act); (2) Unfair competition under 15 U.S.C. § 1125(a) (Lanham Act); (3) "Product Disparagement/Trade Libel"; (4) tortious interference; (5)

unfair competition under the Washington Consumer Protection Act ("CPA"); (6) privacy violations under the CPA; (7) intentional infliction of emotional distress ("IIED") or negligent infliction of emotional distress ("NIED"); (8) defamation; (9) false light; (10) declaratory judgment of patent noninfringement; and (11) declaratory judgment of patent invalidity. (FAC (Dkt. # 10) ¶¶ 107-88.) The court dismissed Plaintiffs' patent claims, Counts 10 and 11, on October 20, 2017. (*See* 10/20/17 Order (Dkt. # 32) at 37.) Defendants later moved for summary judgment on Plaintiffs' remaining claims. (*See* 1st MSJ (Dkt. # 79).) The court denied Defendants summary judgment with respect to (1) Plaintiffs' Lanham Act and Washington Consumer Protection Act claims based on statements related to RED's expenditures on testing and certifying its media cards and the storage capacity of RED's SSD media cards, and (2) Plaintiffs' tortious interference claim, but granted summary judgment in all other respects. (*See* 4/20/20 Order (Dkt. # 93) at 27.)

Defendants now move for summary judgment a second time on Plaintiffs' remaining claims. The court now considers Defendants' motion.

### III.   ANALYSIS

The court first addresses an initial matter Plaintiffs raise regarding the timeliness of Defendants' second motion for summary judgment. The court next sets forth the applicable legal standard before analyzing Defendants' motion.

**A.   Timeliness of Defendants' Motion**

Plaintiffs contend that Defendants' second motion for summary judgment "is an untimely and unsupported motion for reconsideration." (*See* Resp. at 3.) In support of

1    this assertion, Plaintiffs rely exclusively on Local Civil Rule 7(h), which governs motions

2    for reconsideration.  (*See id.* at 3-4 (citing Local Rules W.D. Wash. LCR 7(h)).)

3    Defendants' motion, however, is not a motion for reconsideration, but rather a second

4    summary judgment motion, brought several months after the first.  Because it is not a

5    contemporaneous motion, *see* Local Rules W.D. Wash. LCR 7(e)(3), and is brought prior

6    to the dispositive motions deadline in this case (*see* Sched. Order (Dkt. # 75) at 1), it is

7    timely and is properly filed under this district's local rules.

8    **B.    Legal Standard**

9           Summary judgment is appropriate if the evidence shows "that there is no genuine

10   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Galen v.

12   Cty. of L.A., 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

13   outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A

14   factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact

15   finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,

16   992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).  The moving party bears the

17   initial burden of showing there is no genuine dispute of material fact and that it is entitled

18   to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear

19   the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two

20   ways:  (1) by producing evidence negating an essential element of the nonmoving party's

21   case, or (2) by showing that the nonmoving party lacks evidence of an essential element

22   of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1106

1    (9th Cir. 2000).  If the moving party meets its burden of production, the burden then

2    shifts to the nonmoving party to identify specific facts from which a fact finder could

3    reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477

4    U.S. at 250.

5            The court is "required to view the facts and draw reasonable inferences in the light

6    most favorable to the [nonmoving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007)

7    (internal quotation marks and citation omitted).  The court may not weigh evidence or

8    make credibility determinations in analyzing a motion for summary judgment because

9    those are "jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.  However,

10   the nonmoving party "must do more than simply show that there is some metaphysical

11   doubt as to the material facts . . . . Where the record taken as a whole could not lead a

12   rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

13   *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec.*

14   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

15   **C.      Plaintiffs' Remaining Lanham Act Claim**

16           Defendants move for summary judgment on Plaintiffs' remaining Lanham Act

17   claim, which is based on two groups of statements:  (1) RED's expenditures on testing

18   and certifying its media cards and (2) the storage capacity of RED's SSD media cards.

19   (Mot. at 9-17.)  The court sets forth the applicable legal standard under the Lanham Act

20   before addressing in turn each of these three groups of statements.

21   //

22   //

1.  Lanham Act Legal Standard

15 U.S.C. § 1125 Section 1125 of the Lanham Act "allows one competitor to sue another if it alleges unfair competition arising from false or misleading product descriptions."  15 U.S.C. § 1125; *see also Pom Wonderful LLC v. The Coca-Cola Co.*, 573 U.S. 102, 106 (2014).  The cause of action the Lanham Act creates imposes civil liability on any person who "uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U. S. C. §1125(a)(1).  The elements of this claim are (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products."  *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012); *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citing *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)).

"Statements of opinion," as opposed to statements of fact, "are not generally actionable under the Lanham Act."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins.*

1    *Co.*, 173 F.3d 725, 731 (9th Cir. 1999). "Whether an allegedly defamatory statement is

2    one of opinion or fact is a question of law." *Gardner v. Martino*, 563 F.3d 981, 986 (9th

3    Cir. 2009). Courts in this circuit apply a three part test to make this determination, and

4    analyze: "(1) whether the general tenor of the entire work negates the impression that the

5    defendant was asserting an objective fact, (2) whether the defendant used figurative or

6    hyperbolic language that negates the impression, and (3) whether the statement in

7    question is susceptible of being proved true or false." *Id.* at 987.

8        "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may

9    show that the statement was literally false, either on its face or by necessary implication,

10   or that the statement was literally true but likely to mislead or confuse consumers." *See*

11   *id.* "Only an unambiguous message can be literally false." See *Nutrition Distribution*

12   *LLC v. PEP Research, LLC*, No. 16CV2328-WQH-BLM, 2019 WL 652391, at *4 (S.D.

13   Cal. Feb. 15, 2019) (quoting *Novartis Consumer Health v. Johnson & Johnson*, 290 F.3d

14   578, 588 (3d Cir. 2002)). If a statement is literally false, courts presume there is

15   deception and the plaintiff need not prove how buyers perceive it. *See Time Warner*

16   *Cable, Inc. v. DIRECTV, Inc*., 497 F.3d 144, 153 (2d Cir. 2007). If a statement is true,

17   the plaintiff must provide additional evidence that the statement "is nevertheless likely to

18   mislead or confuse consumers." *Id.* Reactions of the public to determine whether a

19   literally true statement misleads customers are typically tested through the use of

20   consumer surveys. *Southland Sod Farms*, 108 F.3d at 1139. To survive summary

21   judgment, a plaintiff must provide admissible evidence of literal falsity or customer

22   confusion beyond self-serving conclusory statements. *See Schering–Plough Healthcare*

*Prods. v. Schwarz Pharma*, 586 F.3d 500, 513 (7th Cir. 2009) ("[The plaintiff] cannot just intone 'literal falsity' and by doing so prove a violation of the Lanham Act.").

2.  RED's Expenditures on Testing and Certifying its Media Cards

In a Reduser.net forum post on July 31, 2016, Mr. Land wrote that RED:

> spent millions of dollars testing, certifying and QC every media card that we ship.  It's why we have significantly less card errors than other companies using generic media . . . even reputable generic media.

(*See* FAC ¶ 50; Forum Posts at JT001358.)  Although this statement is not ambiguous and can be tested by direct comparison to evidence regarding the amount of money RED spent, neither party submitted such evidence during the parties' prior round of summary judgment briefing (*see* 4/20/20 Order at 16), nor did the parties submit evidence of whether Defendants made this statement in a "commercial advertisement," *see Skydive Ariz.*, 673 F.3d at 1110.

Now, Defendants submit the following additional evidence to support the truth of Mr. Land's statement:  (1) A declaration from Roshan Bijlani, RED's "Senior Director, Program Management – New Products" (*see* Bijlani Decl. (Dkt. # 95) ¶ 2); (2) a spreadsheet that identifies hours spent on research, development, testing, and quality control tasks for RED's Mini Mag products between January 2013 and January 2017 (*see id.* ¶ 3, Ex. 1 ("Spreadsheet")); and (3) a declaration from Mark O'Dell, RED's "Senior Director, System Test"  (*see* O'Dell Decl. (Dkt. # 96) ¶ 2)).  Mr. Bijlani declares that "RED spent at least 9,944 engineering hours developing the Mini Mag product line," and that "RED's average hour[ly] rate for its engineers is $150 per hour."  (Bijlani Decl. ¶¶ 3-4.)  At $150 per hour, 9,944 hours equates to a total expenditure of $1,491,600.00.

1    (*See id.* ¶ 4.)  Mr. Bijlani further declares that "[t]his payroll cost does not include the

2    substantial expenses for parts and materials used in testing, but which would push the

3    total cost even higher."  (*Id.* ¶ 5.)  Additionally, Defendants now argue that Plaintiffs lack

4    evidence that the statement was material in that it influenced customers' purchasing

5    decisions (*see* Mot. at 15) or that Plaintiffs were injured or were likely to be injured as a

6    result of the statement (*see id.* at 2).

7         In response, Plaintiffs do not submit evidence that Defendants made the above or

8    similar statements in a "commercial advertisement," and repeat their assertion from their

9    response to Defendants' prior summary judgment motion that RED "could not have spent

10   millions of dollars developing R[ED]'s SSD because R[ED]'s allegedly 'customized'

11   memory storage device is a generic SSD."  (Resp. at 8.)  However, Plaintiffs' evidence in

12   support of this claim is limited to (1) the declaration of Jinni Tech's owner (and Plaintiff)

13   Bruce Royce (*see id.* at 8-13 (citing 2nd Royce Decl. (Dkt. # 100))) and (2) an

14   unauthenticated email purportedly from a representative of Micron, the company that

15   produces the SSD cards that RED ultimately uses, stating that "[i]t is unlikely that the

16   contractor made FW modification on his own as the access to the FW area on the disk

17   require [sic] VU commands which we don't provide to our customers"  (*see id.* ¶ 20, Ex.

18   5).  There is no declaration from a Micron representative and the email does not refer to

19   Defendants.  Even in the light most favorable to Plaintiffs, this evidence does not create a

20   genuine dispute of material fact that Mr. Land's statement about RED's expenditures is

21   false.

22   //

1    However, even if Plaintiffs had submitted evidence sufficient to create a genuine

2    dispute of material fact that the statement is literally false, Plaintiffs fail to provide

3    evidence to support two of the remaining elements of a Lanham Act claim.  (*See*

4    *generally* Resp.)  Deception is presumed with a literally false statement, but the deception

5    must also be material, it must have been made in a commercial advertisement, the

6    defendant must have caused the statement to enter interstate commerce, and the plaintiff

7    must be injured (or be likely to be injured) as a result of the false statement in the form of

8    lost sales or lost goodwill associated with the plaintiff's products.  *See, e.g.*, *Skydive*

9    *Ariz., Inc.*, 673 F.3d at 1110; *Southland Sod Farms*, 108 F.3d at 1139 (citing *Cook,*

10   *Perkiss and Liehe, Inc.*, 911 F.2d at 244).  Plaintiffs fail to support these remaining

11   elements with admissible evidence.  Accordingly, Defendants are entitled to summary

12   judgment on Plaintiffs' Lanham Act claim with respect to statements regarding RED's

13   expenditures on testing, certifying, and engaging in quality control on its products.

14       3.   Storage Capacity of RED's SSD Media Cards

15    The court previously denied summary judgment in favor of Defendants on

16   Plaintiffs' Lanham Act claims with respect to Defendants' statements about their media

17   cards' storage capacity.  (*See* 4/20/20 Order at 18.)  In doing so, the court noted that the

18   parties appeared to agree that RED markets its 512 gigabyte SSD media as having a

19   capacity of 512 gigabytes of storage space, but that "neither party submit[ted] evidence

20   showing the specific statements" RED made, and "[w]ithout that evidence, the court is

21   unable to determine whether any specific statement is ambiguous or not, and therefore

22   whether Plaintiffs are required to submit evidence of customer confusion."  (*Id.* at 17-18.)

1    Now, Defendants contend that Plaintiffs fail to identify any specific commercial

2    advertising or promotion that gives rise to their Lanham Act claim with respect to storage

3    capacity.  (Mot. at 14.)  Defendants therefore contend that Plaintiffs' claim must relate

4    only to RED's "general identification of its product as '512GB.'"  (*Id.*)  In response,

5    Plaintiffs claim that Defendants "falsely labeled *and advertised* the storage capacity" of

6    RED's SSD cards (*see* Resp. at 2 (emphasis added)) and that Defendants made "over

7    inflated statements about storage capacity" (*see id.* at 14).  However, Plaintiffs submit no

8    evidence of advertisements or statements beyond RED's labeling of its products.  (*See*

9    *generally id.*)  Moreover, like Plaintiffs' claim with respect to RED's expenditures,

10   Plaintiffs fail support the remaining elements of their claim with admissible evidence.

11   Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Lanham Act

12   claim with respect to RED's labeling of its SSD cards as having a 512 gigabyte storage

13   capacity.

14   **D.    Plaintiffs' Remaining CPA Claim**

15          Plaintiffs' remaining claim under the CPA is based on the same alleged facts that

16   underlie Plaintiffs' Lanham Act unfair competition claims.  (*See* FAC ¶ 144 (asserting

17   that "the acts described above" violate the CPA).)  The elements of a CPA action are "(1)

18   unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest

19   impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation."

20   *Bain v. Metro. Mortg. Grp., Inc.*, 285 P.3d 34 (Wash. 2012).  Courts considering CPA

21   claims must take guidance from "final decisions of the federal courts . . . interpreting the

22   various federal statutes dealing with the same or similar matters."  RCW 19.86.920.  The

1   CPA "shall be liberally construed that its beneficial purposes may be served."  RCW

2   19.86.920.  *Id.*  "[T]here is no question that false advertising within the scope of the

3   Lanham Act (except perhaps for its interstate commerce requirement) is an unfair or

4   deceptive practice within the scope of the CPA."  *CertainTeed Corp. v. Seattle Roof*

5   *Brokers*, No. C 09-563 RAJ, 2010 WL 2640083, at *6 (W.D. Wash. June 28, 2010).

6          As discussed above, Plaintiffs fail to provide evidence to create a genuine dispute

7   of material fact that Defendants' statements regarding their expenditures or the storage

8   capacity of their media cards are false.  *See supra* § III.C.2.  Plaintiffs also fail to cite

9   authority under which such statements may be deemed deceptive acts or practices under

10  the CPA.  (*See generally* Resp.)  In fact, Plaintiffs do not refer to the CPA at all in their

11  responsive brief.  (*See generally id.*)  Moreover, Plaintiffs fail to explain how these

12  statements caused injury to their business or property.  (*See generally id.*)  Because

13  Plaintiffs fail to submit evidence to support essential elements of their CPA claim,

14  Defendants are entitled to summary judgment on that claim.

15  **E.    Tortious Interference**

16         Plaintiffs allege that Defendants are liable for tortious interference based on the

17  same statements Defendants made about Plaintiffs discussed above.  (*See* FAC ¶ 138.)  In

18  their complaint, Plaintiffs allege that "[c]ustomers who preordered the JinniMag canceled

19  their orders after reading RED's and Mr. Land's messages on Facebook and

20  [R]eduser.net.  Other interested customers were deterred from placing orders."  (*See id.*

21  ¶ 140.) "To prove tortious interference, the plaintiff must produce evidence sufficient to

22  support all the following findings:  (1) the existence of a valid contractual relationship or

ORDER - 15

business expectancy; (2) the defendant's knowledge of and intentional interference with

that relationship or expectancy; (3) a breach or termination of that relationship or

expectancy induced or caused by the interference; (4) an improper purpose or the use of

improper means by the defendant that caused the interference; and (5) resultant damage."

*Tamosaitis v. Bechtel Nat'l, Inc.*, 327 P.3d 1309, 1313 (Wash. Ct. App. 2014) (quoting

*Eugster v. City of Spokane*, 91 P.3d 117, 123 (Wash. Ct. App. 2004)).  Although

differences exist, the legal standards for tortious interference with contract and tortious

interference with a business expectancy or relationship largely overlap.  *Compare* Wash.

Pattern Jury Instr. Civ. WPI 352.01 (7th ed. July 2019) *with* Wash. Pattern Jury Instr.

Civ. WPI 352.02 (7th ed. July 2019).  Exercising one's legal interest in good faith is not

improper interference.  *Elcon Const., Inc. v. E. Washington Univ.*, 273 P.3d 965, 971

(Wash. 2012.).

        Washington courts have determined conclusively that pecuniary loss is a

"threshold element for recovery under the tort of interference with a business relationship

just as it is for the tort of interference with a contract."  *Tamosaitis*, 327 P.3d at 1314

(citing Restatement (Second) of Torts § 766 cmt. (t) (Am. Law Inst. 1979) ("The cause of

action is for pecuniary loss resulting from interference.")).  Although the precise amount

of damages need not be shown with mathematical certainty, "competent evidence in the

record" must support the claimed damages.  *Mut. of Enumclaw Ins. Co. v. Gregg Roofing,

Inc.*, 315 P.3d 1143, 1150 (Wash. Ct. App. 2013) (quoting *Fed. Signal Corp. v. Safety

Factors, Inc.*, 886 P.2d 172, 188 (Wash. 1994)); *see also Wenzler & Ward Plumbing &

Heating Co. v. Sellen*, 330 P.2d 1068, 1070 (Wash. 1958) (holding that uncertainty as to

1    the amount or quantum of damages is not fatal to a plaintiff's claim, but uncertainty as to

2    the fact of damage is fatal).  "Evidence of damage is sufficient if it affords a reasonable

3    basis for estimating loss and does not subject the trier of fact to mere speculation or

4    conjecture."  *Id.* (quoting *Clayton v. Wilson*, 227 P.3d 278, 285 (Wash. 2010)).

5         In a tortious interference case, the plaintiff must show that its claimed pecuniary

6    damages "are a reasonable expectation and not based on merely wishful thinking."

7    *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 699 P.2d 217, 220

8    (Wash. 1985) (citing *Caruso v. Local 690, Int'l Bhd. of Teamsters*, 653 P.2d 638, 643

9    (Wash. Ct. App. 1982), *rev'd on other grounds by* 670 P.2d 240 (Wash. 1983)).

10   Additionally, the plaintiff must show "a sufficiently close, actual, causal connection"

11   between the alleged interference and the alleged loss.  *See id.* at 220.  "Although

12   causation usually is an issue for the jury . . . '[w]here inferences from the facts are remote

13   or unreasonable . . . factual causation is not established as a matter of law."  *See id.*

14   (quoting *Walters v. Hampton*, 543 P.2d 648, 652 (Wash. Ct. App. 1975)).

15        In their prior motion for summary judgment, Defendants argued that they were

16   entitled to summary judgment on Plaintiffs' tortious interference claim on the basis that

17   Mr. Land's alleged statements about Jinni Tech are not false.  (*See* 1st MSJ at 16-17.)

18   Because falsity is not an element of a tortious interference claim, and because Defendants

19   did not discuss Plaintiffs' tortious interference claim aside from their falsity argument,

20   the court denied summary judgment in favor of Defendants on Plaintiffs' tortious

21   interference claim.  (*See* 4/20/20 Order at 21-22 (citing *Nissan Fire & Marine Ins. Co.*,

22   //

1   210 F.3d at 1106 (holding that the moving party who does not bear the burden of

2   persuasion must 1) produce evidence negating an essential element of the nonmoving

3   party's case, or 2) show that the nonmoving party lacks evidence of an essential element

4   of its claim or defense)).)

5       Now, Defendants assert that Plaintiffs lack evidence that RED used any improper

6   means or an improper purpose that harmed Plaintiffs.  (*See* Mot.at 17-18.)  Defendants

7   further contend that they were asserting their legal rights when they advised their

8   customers that the JinniMag was not a licensed third-party accessory.  (*Id.* at 18.)

9   Finally, Defendants argue that Plaintiffs have no evidence that they suffered damages as a

10  result of Defendants' conduct.  (*Id.* at 19-20.)

11      In response, Plaintiffs focus almost entirely on an assertion that RED's prior

12  patent infringement lawsuit—not Defendants' statements—"is the wrongful act

13  supporting [Plaintiffs'] claim for tortious interference."  (Resp. at 4-5.)  This assertion

14  appears contrary to Plaintiffs' operative complaint, in which Plaintiffs allege in their

15  tortious interference claim that Defendants engaged in a "malicious campaign" based on

16  "Mr. Land's messages on Facebook and reduser.net."  (*See* FAC ¶¶ 138-40.)

17      Regardless of whether the court evaluates Plaintiffs' tortious interference claim in

18  terms of "Mr. Land's messages" or Plaintiffs' new allegations about a frivolous lawsuit,

19  Plaintiffs' tortious interference claim fails because Plaintiffs fail to provide the necessary

20  evidence of pecuniary loss.  Plaintiffs contend they suffered damages in two forms.  First,

21  Plaintiffs "estimate" that "at least 20%" of the 90,981 RED camera users—calculated

22  "based on membership of various R[ED] internet user forums"—"would have bought one

of Jinni [Tech's] storage devices at some point." (*Id.* at 15.)  The only support for

Plaintiffs' calculations is Mr. Royce's "estimates" in his declaration.  (*See id.* at 15-16

(citing 2nd Royce Decl. ¶ 33).)  Plaintiffs fail to support Mr. Royce's "estimates" with

any business records, projections, or other analysis based on Plaintiffs' actual sales.

Therefore, Plaintiffs' evidence of pecuniary damage is insufficient, because it does not

afford "a reasonable basis for estimating loss" and would subject the jury to "mere

speculation or conjecture."  *See Wenzler*, 330 P.2d at 1070 (quoting *Clayton*, 227 P.3d at

285).  Plaintiffs' only other evidence of potential pecuniary loss consists of a few records

of changed or cancelled Jinni Tech orders.  (*See* 2nd Rankin Decl. (Dkt. # 97) ¶ 2, Ex. 1.)

However, in none of these records is there evidence that Defendants' conduct caused the

customers to cancel their orders.  (*See id.*)

   Therefore, Defendants are entitled to summary judgment on Plaintiffs' tortious

interference claim.

## IV.   CONCLUSION

   For the foregoing reasons, the court GRANTS Defendants' second motion for

summary judgment (Dkt. # 94).  As Plaintiffs have no remaining claims, this case is

dismissed.  A judgment will follow.

   Dated this 28th day of August, 2020.


JAMES L. ROBART
United States District Judge

ORDER - 19